## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 9:12-cv-80577-KAM

BRIAN KEIM, an individual, on behalf
of himself and all others similarly situated,

      Plaintiff,

vs.

ADF MIDATLANTIC, LLC, a foreign limited
liability company, et al.

      Defendants.

_____/

### AMERICAN HUTS, INC.'S COMBINED MOTION TO DISMISS CLASS ACTION COMPLAINT PURSUANT TO FRCP 12(B)(1) FOR LACK OF FEDERAL SUBJECT MATTER JURISDICTION AND FRCP 12(B)(6) FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED, WITH INCORPORATED MEMORANDUM OF LAW

      American Huts, Inc. ("AHI") respectfully submits this Combined Motion to Dismiss Class Action Complaint Pursuant to FRCP 12(b)(1) for Lack of Federal Subject Matter Jurisdiction and FRCP 12(b)(6) for Failure to State a Claim for Which Relief Can be Granted (the "Motion"), with Incorporated Memorandum of Law.[1]

### PRELIMINARY STATEMENT

      Brian Keim's Complaint ("Keim" or "Plaintiff"), based on a mere five paragraphs of "substantive allegations," purports to assert claims on behalf of himself and a putative class of similarly situated persons for alleged negligent (Count I) and willful (Count II) violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). Although Keim never makes the

---

[1]     Contemporaneously with this Motion, the other three defendants—ADF MidAtlantic, LLC, ADF Pizza I, LLC and ADF PA, LLC (collectively, the "non-Florida Defendants")—filed a joint motion to dismiss pursuant to FRCP 12(b)(2) due to lack of personal jurisdiction. In the event this Court denies their request to be dismissed on that basis, the non-Florida Defendants expressly adopt and incorporate the arguments and authorities set forth herein in support of dismissal.

straightforward allegation that he personally received a particular unsolicited text message from or on behalf of AHI, he brazenly asks this Court to award up to $1,500 to any recipient in the United States for any allegedly unsolicited texts sent "on behalf of the ADF Companies."[2]  Notably, this case is not a garden variety TCPA case.  Rather, Keim asserts a heretofore unrecognized (and unasserted) theory that an independent decision by a mobile subscriber (someone who has opted into a text program) to manually input a mobile number and forward a text message is somehow actionable under the TCPA.

Keim's attempt to manufacture a class action lawsuit should not be countenanced.  First, the so-called "friend forwarded" text messages are beyond the proscriptions of the TCPA, which was passed in 1991 for the purpose of regulating the telemarketing industry's use of sophisticated equipment, generally known as "auto-dialers," to generate millions of automated telephone calls to residential and business numbers (so-called "robo-calls").  Thus, in order to state a claim for relief, a plaintiff must allege and ultimately prove that the calls or texts were made using an automated telephone dialing system ("ATDS"), which is defined as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator [and] to dial such numbers."

Despite Plaintiff's persistent efforts to portray AHI as a "mobile spammer" by attaching promotional materials of a non-party mobile marketing company, (*see* Compl., Ex. A), all friend forwarded texts sent on AHI's behalf were sent *manually* by a live person (as they must), not by an ATDS.  Friend forwarded texts can *only* be sent by a mobile subscriber (*i.e.*, someone who has opted-in to receive text messages) when they make a decision to send the text to someone and then physically input the 10-digit mobile number of the intended friend or acquaintance so that they can receive the text in question.  Friend forwarded text messages are thus neither automated nor random.

---

[2]       Although the Complaint refers to the AHI and the non-Florida Defendants collectively as "ADF Companies," no such legal entity actually exists.  Nor is there any amalgam of companies doing business as ADF Companies.  Rather, AHI and the non-Florida Defendants are each separate and distinct entities.

Even assuming, for a moment, the implausible notion that Keim received friend forwarded texts via an ATDS (*i.e.*, that a human being qualifies as an ATDS), the Federal Communications Commission ("FCC") has specifically exempted such calls from the TCPA's proscriptions.  The FCC, the agency charged with implementing the TCPA, has issued regulations, codified at 47 C.F.R. § 64.1200(c)(E)(ii), which set forth an explicit exception to the generalized restriction on telemarketing using an ATDS when "the telemarketer making the call has a personal relationship with the recipient of the call."  A "personal relationship" is defined as "any family member, friend, or acquaintance of the telemarketer making the call."  *Id.* § 64.1200(f)(14).  This exemption applies to calls (including text messages) made to wireless numbers.  Because Congress delegated TCPA rulemaking authority to the FCC, 47 U.S.C. § 227(b)(2), the FCC's personal relationship exemption is entitled to *Chevron* deference.

In order to prolong his claim, Keim makes the rather startling allegation that he "has never provided . . . *any other party* with his cellular telephone number *in any manner whatsoever*."  (Compl. ¶ 23 (emphasis added).)  Regardless of the veracity of his allegations, Keim's TCPA claims fail as a matter of law.  As is more plausible, a family member, friend or acquaintance of Keim's forwarded an AHI-related text to his cell phone.  This means that such texts are outside the purview of the TCPA's prohibitions because a human being is not an ATDS (and the personal relationship exemption applies).  Conversely, even if Keim's implausible and self-serving allegation is to be believed, and the texts in question were sent to him inadvertently (*i.e.*, someone accidentally or intentionally inputted his number), such communications would constitute transmission of a single, "one-off" text message, not the kind of *en masse* bulk solicitations the TCPA was designed to address.  *See, e.g.*, *Ibey v. Taco Bell Corp.*, 2012 WL 2401972, at *3 (S.D. Cal. June 18, 2012) (dismissing TCPA text class action because the "spirit of the [TCPA]" is "prevention of unsolicited marketing in a bulk format").  In short, Keim's allegations do not state a plausible right to relief that is more than merely speculative, as is required under federal pleading standards.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Carson Harbor Village, Ltd. v.*

*Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (stating that "[s]tatutes must be construed consistently with their legislative purpose, not twisted like a pretzel to allow any kind of outlandish interpretation that creative lawyers can dream up.  In interpreting a statute, a court's task is to construe what Congress has enacted").

The Complaint should be dismissed for the additional reason that, in order to avoid the potential costs and disruptions of this litigation, AHI, along with the non-Florida defendants, offered Keim complete monetary and injunctive relief for his asserted TCPA claims.  The offer of the maximum relief recoverable moots Keim's claims and he no longer has a personal stake in this matter.  To allow a case with no motion for class certification pending to continue in federal court when plaintiff no longer maintains a personal stake stretches the bounds of federal jurisdiction beyond the jurisdictional limits set forth in Article III of the U.S. Constitution.

Finally, Keim never makes the simple, straightforward allegation that on a particular day he received a particular unsolicited text from a particular shortcode.[3]  While Keim alleges that unsolicited texts were *sent* from two five-digit shortcodes, Keim never alleges that he himself *actually received* a text from one or both of these shortcodes.  This is not a mere distinction without a difference.  Absent an allegation that Keim sustained an actual "injury-in-fact" sufficient to satisfy standing requirements under Article III of the Constitution, the Complaint should be dismissed.[4]

---

[3]      "Shortcodes" are special cellular telephone exchanges, typically only five- or six-digit extensions, which can be used to address text messages to cell phones.  (Compl. ¶ 15.)

[4]      This is no trifling issue.  Last Term, the Supreme Court granted certiorari and heard oral argument in *First American Financial Corp. v. Edwards* (OT 2011, U.S. No. 10-708), which presented the question of whether mere conferral of statutory standing to sue under a putative consumer protection statute, without more, comports with Article III standing requirements.  The Court ultimately dismissed the writ as improvidently granted on the last day of the Term, *see* 132 S. Ct. 2536 (June 28, 2012), but the Court's clear interest in resolving this issue demonstrates its importance as an unsettled Constitutional question.

## BACKGROUND

I.   KEIM'S ALLEGATIONS.

A.   The Friend Forwarder Marketing Program.

Keim's Complaint continually endeavors to paint a picture of AHI (and the non-Florida defendants) as spammers.  For instance, Keim spends an inordinate amount of space discussing events completely unrelated to AHI or any of the non-Florida defendants.  Keim's claims are seemingly premised on third-party promotional materials and a transcript from a rambling interview of Ty Morse, the CEO of Songwhale, a mobile-marketing company based out of Pittsburgh, Pennsylvania.  (*See* Compl. DE 1, pp. 8–12 & Ex. A.) Keim begins by alleging that "[a]t some point in 2009, ADF COMPANIES engaged SONGWHALE to assist with its text messaging marketing efforts."  (Compl., DE 1, p. 7, ¶ 21.)[5]  Although patently false, for purposes of this Motion only, AHI will move on to Exhibit A— the sixteen-page Songwhale pamphlet Keim attached to the Complaint in putative support of his claims.  The exhibit is merely promotional material for Songwhale.  It appears that Plaintiff merely copied whole passages from Songwhale's promotional materials into his Complaint.  For instance, page 15 references a Pizza Hut case study of a friend-forwarder campaign that was conducted in April 2009 in Pittsburgh, Pennsylvania.  (*Id.* at 15.)  Notably, none of the named defendants own or operate any Pizza Hut locations in Pittsburgh, nor have any of them (as stated in the exhibit) run "television promotions on Fox 53 and WPMY" nor "created a web widget" at www.pizzahut.com for special coupons and free prizes.

Undaunted, Keim inserts a three-page block quote from a blog interview conducted with Mr. Morse.  Plaintiff's purpose in drawing this Court's attention to a marketing campaign that occurred outside the region where AHI owns any Pizza Hut franchises is unclear.  However, to the extent that

---

[5]      At certain portions of the Complaint, Plaintiff repeats paragraph numbers, *i.e.*, there is a paragraph 21 on page 7 and on page 8 of the Complaint.  When citing to paragraphs in the Complaint that are improperly numbered, the page number is included for clarity.

Plaintiff is trying to paint AHI (as well as the non-Florida defendants) as "spammers" by tying them to other marketing campaigns, neither Exhibit A nor Paragraph 20 (where Keim discusses the program) is probative of Keim's allegations.

Keim's attempt to manufacture a class action lawsuit "according to Songwhale" continues.  As Keim explains—and again, according to Songwhale, a friend-forwarder marketing "scheme"[6] is a viral text-messaging ad campaign which enables people who affirmatively opt-in to receive text messages to then forward those texts to the cell phone numbers of their friends, family and other acquaintances. (Compl., DE 1, p. 7, ¶ 22.)  In a friend forwarder campaign, the advertiser runs a traditional media spot (*i.e.*, a TV or radio commercial or a print ad) encouraging interested viewers/listeners/readers to send a text message to a particular shortcode if they want to subscribe to certain mobile offerings.  If a person opts in (also known as subscribes) by sending a text to the designated shortcode, the subscriber receives a "bounce-back" text informing that he/she has been subscribed to that mobile campaign (and is thus eligible to receive certain promotional materials and/or various prizes).  The subscriber also receives a "bounce-back" text stating that the subscriber can receive additional items by forwarding the text to friends, family and acquaintances who may be interested in receiving certain announcements via text (for instance, the ability to enter contests).  In order for a text message to be sent to a "recipient friend," the sender friend (the subscriber) must *manually* input the phone number of the recipient friend. (Compl., DE 1, ¶ 26.)  That is, but for the sender friend's independent decision to forward the text via the manual act of physically inputting the recipient friend's ten-digit mobile number, the recipient friend (Keim, for example) would never receive a forwarded text message.  It is this type of manually-inputted friend-forwarder campaign that Keim contends violates the TCPA, and which forms the basis of his putative nationwide class.  (Compl., DE 1, ¶ 28 (defining putative class)).

---

[6]     What Keim conveniently labels "scheme," others—including the Mobile Marketing Association—call mobile marketing program.

## B.      Allegations Specific to Mr. Keim.

It is with that backdrop that Keim, without specifying which of the four named entities,[7] alleges he "began receiving unwanted commercial text messages from Defendants starting on or about February 2011." (*Id.* ¶ 24.)  Under the heading of "some examples of text messages sent by Defendants" Keim describes two text messages allegedly sent on November 30, 2011 (in the first instance) and on January 12, 2012 (in the second instance), both of which allegedly offered promotional deals on Pizza Hut menu items.[8]  (*Id.*)  Keim contends that text messages "identical" to the 11/30/11 and 1/12/12 text messages were sent to him and other putative class members "by Defendants *en masse* using an automatic telephone dialing system, also known as an 'auto-dialer.'" (*Id.* ¶ 25.)  Keim alleges that he was involuntarily opted into a Pizza Hut text-messaging campaign by an "unknown party" via use of a "Friend Forwarder" marketing campaign.  (*Id.* ¶ 26.)

## C.      The TCPA.

A review of the statute and legislative history makes clear that the TCPA cannot be read to impose liability for a text that is forwarded as a result of a subscriber's independent decision to manually input a "friend's" mobile number.  Passed in 1991 through a bipartisan Congressional effort, the TCPA was designed to combat various abusive telemarketing practices by certain segments of the telemarketing industry—particularly its use of sophisticated equipment to place millions of automated phone calls to individuals and businesses.  *See* S. Rep. 102-178, at 4–5 (1991), *reprinted in* 1991

---

[7]      Although his Complaint names four separate and distinct legal entities that each own and operate Pizza Hut franchises in different regions of the United States, Plaintiff repeatedly refers to the entities collectively, (*see* Compl. ¶¶ 1, 2, 24–28.), as if the alleged actions of one entity could somehow be imputed or attributed to another. They cannot.  *See, e.g.*, *Petrovic v. Princess Cruise Lines, Ltd.*, No. 12-cv-21588, 2012 WL 3026368, at *3 (S.D. Fla. July 20, 2012) ("[A] complaint that lumps all the defendants together in each claim and provides no factual basis to distinguish their conduct fails to satisfy [FRCP] 8." (internal quotations omitted)).

[8]      While Keim claims he began receiving unsolicited texts in February 2011, his Complaint does not include discussion of any text message allegedly sent prior to November 30, 2011.

U.S.C.C.A.N. 1968, 1972 (stating that the TCPA's purpose is to prevent unsolicited automated telemarketing and bulk communications sent out on a widespread scale).

> The TCPA prohibits any person from making:

>> any call (other than a call made for emergency purposes or made with the prior express consent of the called party) *using any automatic telephone dialing system* . . .

>> (iii) to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call.

47 U.S.C. § 227(b)(1)(A) (emphasis added).[9]  The TCPA defines an ATDS as "equipment which has the capacity" to both (i) "store or produce telephone numbers to be called, using a random or sequential number generator" *and* (ii) "dial such numbers."  *Id.* § 227(a)(1).[10]  In describing ATDSs, a House report stated that:

>> these systems are used to make millions of calls every day.  Each system has the capacity to automatically dial as many as 1,000 phones per day.  Telemarketers often program their systems to dial sequential blocks of telephone numbers, which have included those of emergency and public service organizations, as well as unlisted numbers.

H.R. Rep. 102-317, at 10 (1991).  Congress further explained that:

>> Once a phone connection is made, automatic dialing systems can 'seize' a recipient's telephone line and not release it until the prerecorded message is played, even when the called party hangs up.  This capability makes these systems not only intrusive, but, in an emergency, potentially dangerous as well.

---

[9]      AHI does not contest that a text message qualifies as a "call" under the TCPA.  *Satterfield v. Simon & Schuster*, 569 F.3d 946, 952 (9th Cir. 2009); *In re Rules & Regulations Implementing the TCPA of 1991*, Report and Order, 18 FCCR 14014, 14115 (July 3, 2003).

[10]      The TCPA does not define "capacity" in the context of the definition of ATDS, and the issue was left unresolved in the FCC's recent TCPA Order.  *See In re Rules and Regulations Implementing the TCPA of 1991*, CG Docket No. 02-278 (Feb. 15, 2012).  Currently pending before the FCC are multiple petitions from various tech companies requesting the agency to clarify and define the scope of the term "capacity" as used under 47 U.S.C. § 227(a)(1).  *See, e.g.*, *In re GroupMe, Inc.*, *Petition for Expedited Declaratory Ruling and Clarification*, CG Docket No. 02-278 (March 1, 2012); *In re SoundBite Communications, Inc., Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278 (Feb. 16, 2012).

*Id.* at 10-11.  None of these issues arise in this case, which involves an independent decision by a human being who has voluntarily subscribed (opted-in) to a mobile marketing campaign to manually input the mobile number of someone who they believe would be interested in receiving similar material. Such a friend forwarded text message is not part of a bulk communication to multiple users.[11]

Congress empowered the FCC with rulemaking authority under the TCPA, *id.* § 227(b)(2), and subsequent FCC promulgations make clear that the TCPA is chiefly designed to alleviate a particular problem—namely, an increasing number of *automated* calls to certain categories of numbers, including cell phones.  *See, e.g.*, *Rules & Regulations Implementing the TCPA, Final Rule*, 68 Fed. Reg. 44144-01, ¶ 96, 2003 WL 21713245 (July 25, 2003) ("2003 FCC Order").  In 2003, when the FCC concluded from the statutory definition of ATDS that such equipment need only have the *capacity* to store or produce phone numbers, the FCC interpreted ATDS to mean equipment that has the capacity to store or produce "lists of numbers" for purposes of automatically dialing those numbers "*without human intervention*." *Id.* (emphasis added).  There is no indication in either the TCPA legislative history or the FCC's pronouncements that the statute's proscriptions were designed to encompass a human being's *manual* sending of discrete communications to *non-random* numbers via a cell phone.  (*Cf.* Compl. ¶ 26.)

Notably, the TCPA also contains an exception to its proscriptions on telemarketing when the caller has a "personal relationship" with the recipient of the call, which the FCC has defined as "any family member, friend, or acquaintance of the telemarketer making the call."  *See* 47 C.F.R. §§ 64.1200(c)(E)(ii), 64.1200(f)(14). The FCC implemented this exception in recognition of the fact that calls made to persons with whom the caller has a personal relationship "do not adversely affect privacy

---

[11]     Although passed with laudable intentions, during the past twenty years the TCPA's remedial provisions, which provide for statutory damages of up to $1,500 (in the absence of any actual harm) for each violative call, have done more good for the plaintiffs' bar than anyone else. *See, e.g.*, *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) (recognizing the "potential for abuse" in the class action context); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1169 (5th Cir. 1978) ("[T]he potential for abuse is much greater when class actions are resolved through a settlement . . . ."); *Local Baking Prods., Inc. v. Kosher Bagel Munch, Inc.*, 23 A.3d 469, 476 (N.J. Super. 2011) ("We conclude that a class action suit is not a superior means of adjudicating a TCPA suit.").

rights." *See Van Bergen v. Minnesota*, 59 F.3d 1541, 1548 (8th Cir. 1995). In other words, it is reasonable to assume that if two people know each other, neither person will object to receiving a communication from the other, even if it is for telemarketing purposes.

## DISCUSSION

I.   **PLAINTIFF NO LONGER MAINTAINS A PERSONAL STAKE IN THIS LAWSUIT, THUS THE CASE SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION UNDER FRCP 12(B)(1).**

Cognizant of the costs and disruptions that this kind of opportunistic lawsuit can have, on July 16, 2012, AHI, along with the non-Florida Defendants, sent a letter to Plaintiff offering to provide him with the maximum recoverable relief for his alleged TCPA claims were he to prevail, including costs and reasonable attorneys' fees.  (A true and correct copy of counsel's July 16, 2012 Letter is attached as Ex. A to the Declaration of Moises Melendez, sworn to on July 27, 2012 ("Melendez Decl."), which is attached as Ex. 1 hereto.)[12]   Despite the fact that the offer provided Keim all relief he could possibly receive, his counsel rejected the offer by email the following day.  (*See id.*).  As AHI, along with the non-Florida Defendants, have offered Keim complete relief for his TCPA claims, he no longer has Article III standing and his claims are over.  Simply put, Keim cannot persist in suing when he has already prevailed.  Without Article III standing, Keim cannot represent a putative class of similarly situtated persons because he is not similarly situated.  As there is no proposed class representative, the putative class claims must similarly be dismissed.

---

[12]     AHI and the non-Florida Defendants also offered to pay all costs and reasonable attorneys' fees incurred by Keim in bringing this suit, and offered to submit any dispute regarding fees to the Court for resolution.  *See, e.g., Brown v. Kopolow*, No. 10-cv-80593, 2011 WL 283253, at *2–3 (S.D. Fla. Jan. 25, 2011) (Marra, J.) ("Plaintiff's argument that the offer does not give Plaintiff complete relief to which he is entitled is incorrect.").

A.     **AHI'S OFFER OF COMPLETE RELIEF TO KEIM FULLY SATISFIES HIS TCPA CLAIMS AND HENCE THIS CASE SHOULD BE DISMISSED FOR LACK OF FEDERAL SUBJECT MATTER JURISDICTION.**

Article III of the U.S. Constitution restricts the jurisdiction of federal courts to the adjudication of actual "cases and controversies." *See Fla. Wildlife Fed'n, Inc. v. South Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011).   This requirement limits federal courts to deciding "questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968); *see also Swann v. Secretary of Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012) ("We have held that standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.").

An action that does not present an active case or controversy is moot; and as such, a federal court may not consider or decide the merits of it.  *See, e.g.*, *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1332 (11th Cir. 2005); *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001).   Article III's case-or-controversy requirement persists through the entire duration of litigation.  *See, e.g.*, *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (stating that "the parties must continue to have a personal stake in the outcome of the lawsuit").   Therefore, when the issues a case presents are no longer "live" and/or the parties no longer have a cognizable interest in the outcome, the case is moot and must be dismissed for lack of subject-matter jurisdiction.  *See, e.g.*, *Alabama v. U.S. Army Corp of Engineers*, 424 F.3d 1117, 1131 (11th Cir. 2005) ("A case must be viable at all stages of the litigation; it is not sufficient that the controversy was live at inception.").   Additionally, "the plaintiff generally must assert his own legal rights or interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Sims v. State of Fla., Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1468 (11th Cir. 1989) (internal quotations omitted).

The rule that a full offer of settlement moots a controversy applies with full force in the class action context.  A putative class action starts out like any other lawsuit in that plaintiff must have a claim

in its individual capacity before it can attempt to represent the interests of class members who are not presently before the Court. *See, e.g., Tucker v. Phyfer*, 819 F.2d 1030, 1033 (11th Cir. 1987) ("In a class action, the claim of the named plaintiff, who seeks to represent the class, must be live both at the time he brings suit and when the district court determines whether to certify the putative class."). Thus, an offer of complete relief that is extended to Plaintiff prior to any request to certify the lawsuit as a class action lawsuit eliminates the controversy between the parties and leaves nothing for the court to resolve. In those situations, the action is moot and the court is without subject matter jurisdiction. *See, e.g.*, *MacKenzie v. Kindred Hosp. East, LLC*, 276 F. Supp. 2d 1211, 1219 (M.D. Fla. 2003).

*Damasco v. Clearwire Corp.*, 662 F.3d 891, 896–97 (7th Cir. 2011), presented the precise issue now facing this Court. In *Damasco*, plaintiff filed a putative class action lawsuit alleging violations of the TCPA for alleged unsolicited text messages. *Id.* at 893. As in the case at bar, defendant in *Damasco* sent plaintiff's counsel a letter offering to provide complete monetary and injunctive relief. *Id.* Notably, defendant's offer was sent prior to any attempt by plaintiff to certify a class. *Id.* Defendant subsequently moved to dismiss the case on the grounds that the settlement offer "stripped [plaintiff] of his personal stake in the case's outcome and rendered his claim moot." *Id.* The district court found the settlement offer sufficiently definite and dismissed the case as moot. *Id.* at 894.

In affirming the district court, the Seventh Circuit reasoned that "allow[ing] a case, not certified as a class action and with no motion for class certification even pending, to continue in federal court when the sole plaintiff no longer maintains a personal stake *defies the limits on federal jurisdiction expressed in Article III*." *Id.* at 896 (emphasis added). Furthermore, the *Damasco* Court noted that "[e]ven when a complaint clearly and in great detail describes the suit as a class action suit, if the plaintiff does not seek class certification, then dismissal of the plaintiff's claim terminates the suit." *Id.* (internal quotations omitted); *see also Bd. of Sch. Comm'rs of City of Indianapolis v. Jacobs*, 420 U.S. 128, 129–30 (1975) (dismissing class action as moot due to plaintiffs' failure to comply with Rule 23

requirements).  Ultimately, the Seventh Circuit held that "[a]fter [defendant] made its offer, [plaintiff's] federal case was over."  *Id.* at 896.  In doing so, the Court advised that plaintiffs could avoid these mootness issues simply by moving to certify the class at the same time they file their complaint.  *Id.* ("The pendency of that motion [for class certification] protects a putative class from attempts to buy off the named plaintiffs.").

*Damasco* is directly on point, and its reasoning should be adopted by this Court as well.  As in *Damasco*, Keim has brought a TCPA class action suit based on unsolicited text messages.  As in *Damasco*, AHI, along with the non-Florida defendants, offered Plaintiff the maximum relief recoverable under the law *before* Plaintiff filed a motion for class certification.[13]  And finally, as in *Damasco*, Keim's counsel did not accept the settlement offer.[14]  In sum, in all material respects this case is identical to the facts of *Damasco*.  Therefore, because Keim no longer has a personal stake in the TCPA lawsuit, this Court lacks subject matter jurisdiction and thus must dismiss this action pursuant to FRCP 12(b)(1).[15]

AHI is also mindful of the fact that courts in this District are divided on the issue of whether a settlement offer of complete relief moots the case.  Judge Scola recently issued a decision in *Benggio v. Professional Recovery Services, Inc.*, which held that the defendant's offer of complete relief did not moot plaintiff's case because the settlement offer was not an offer of *judgment* made pursuant to

---

[13]     To this date, Keim has still not filed a motion for class certification.

[14]     The case became moot at the moment Keim's counsel came into receipt of the settlement letter.  *See, e.g.*, *Holstein v. City of Chicago*, 29 F.3d 1145, 1146 (7th Cir. 1994) ("Once the defendant *offers* to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledges this *loses outright*, under [FRCP] 12(b)(1), because he has no remaining stake.") (emphasis added).

[15]     AHI recognizes that other Circuits disagree with the *Damasco* approach.  These Circuits have fashioned a new rule that, absent "undue delay," a plaintiff may move to certify a class and avoid mootness after being offered complete relief.  *See Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1091–92 (9th Cir. 2011); *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1249–50 (10th Cir. 2011); *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 920–21 (5th Cir. 2008).  These decisions, however, address offers that, unlike ADF's, were made pursuant to FRCP 68.  Moreover, these decisions neglected to analyze the "offer of settlement" issue in the Article III context, which is the appropriate starting inquiry, and instead focused exclusively on the requirements of Rule 23.

Fed.R.Civ.P. 68.  *See* No. 12-cv-60168, 2012 WL 2930931 (S.D. Fla. July 18, 2012).  In holding that the settlement offer did not moot the claim, Judge Scola explicitly distinguished a Rule 68 offer of judgment from an informal offer of settlement.  *Id.* at *2.  Ultimately, he concluded that because the offer was not, strictly speaking, an offer of judgment, "Defendant has not offered to give Plaintiff a judgment—*i.e.*, everything Plaintiff has asked for."  *Id.* at *3.

AHI respectfully disagrees with the approach taken by Judge Scola, as have numerous other judges.[16]  There is no meaningful difference between an offer of settlement, on the one hand, and a Rule 68 offer of judgment, on the other hand.  A defendant's offer of complete relief to plaintiff moots the suit regardless of whether the offer is a Rule 68 offer or an informal settlement offer.  *See, e.g.*, *Martin v. PPP, Inc.*, 719 F. Supp. 2d 967, 973 (N.D. Ill. 2010) ("[Plaintiff] has failed to convincingly argue that [defendant's] offer [is] inadequate simply because it was not made under Rule 68.");  *Baker v. N.P.F. Liquors, Inc.*, No. 08-cv-3949, 2008 U.S. Dist. LEXIS 116964 (N.D. Ill. Dec. 30, 2008) (declining to distinguish Rule 68 offer from offer of settlement and holding that claim became moot the moment the offer of *settlement* was extended).  Such cases reflect the underlying reality that upon tender of an offer of complete relief Plaintiff has, in essence, already won and there is no basis upon which to litigate.  *See also Stilz v. Standard Bank & Trust Co.*, No. 10-cv-1996, 2010 WL 5158108, at *6 (N.D. Ill. Dec. 14, 2010) ("[I]t is the offer, not the tender, that moots a plaintiff's claims.").[17]

### B.   KEIM HAS NOT ALLEGED AN "INJURY-IN-FACT" SUFFICIENT TO SATISFY CONSTITUTIONAL STANDING REQUIREMENTS.

Even if this Court assumes, as it must, that all the allegations in Keim's Complaint are true, Keim's allegations do not satisfy the standing requirements of Article III of the U.S. Constitution.  To

---

[16]  This issue of whether a plaintiff is entitled to a judgment, as prayed for in the complaint, even though the defendant has offered to pay full damages, is presently on appeal before the Eleventh Circuit in *Zinni v. ER Solutions, Inc.*, No. 10-cv-80780 (S.D. Fla. Apr. 20, 2011), and *Desty v. Collection Information Bureau*, No. 11-cv-80114 (S.D. Fla. June 8, 2011).

[17]  As a simple solution, to avoid mootness Keim should have filed his motion for class certification at the same time he filed his Complaint.  *See Damasco*, 662 F.3d at 896 ("Class-action plaintiffs can move to certify the class at the same time that they file their complaint.").  Keim did not—and has not—done so.

establish Article III standing, a plaintiff must allege (i) an injury-in-fact; (ii) a causal connection between the injury and the conduct complained of and (iii) likelihood that the injury will be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  In order to satisfy the "injury-in-fact" requirement, the alleged injury must constitute "an invasion of a legally protected interest" which is "concrete and particularized."  *Id.* at 560.

Keim's Complaint is utterly devoid of any facts that allege he suffered an *actual injury* as a result of any conduct by AHI.  Although Keim states, in boilerplate fashion, that he "began receiving unwanted commercial texts" starting in February 2011, the only texts that Keim specifically cites are text messages "*sent* by Defendants" on November 30, 2011 and January 12, 2012.  (Compl. ¶ 24.)  Similarly, in the next paragraph Keim again alleges that additional text messages were *sent* to Keim and other putative class members.  (*Id.* ¶ 25.)  In other words, Keim never pleads the existence of any text message sent by or on behalf of AHI that he personally *received*.  Without alleging either the actual receipt of a text message sent by or on behalf of AHI, it is impossible for Keim to clear the "injury-in-fact" threshold necessary for Article III standing.  This is an essential point: Mere congressional authorization to sue does not automatically confer Article III standing. Rather, Article III's injury-in-fact requirement is an independent requirement that limits Congress's ability to create standing under statutes that provide tort-like causes of action in situations involving individual pecuniary harm, *e.g.*, the TCPA.  *See, e.g., Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").   The mere allegation that AHI sent a text, without more, falls short of alleging injury-in-fact.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("Art[icle] III's requirement remains: the plaintiff must still allege a distinct and palpable injury *to himself*.") (emphasis added).

## II. THE COMPLAINT SHOULD BE DISMISSED FOR THE INDEPENDENT REASON THAT KEIM'S THEORY THAT A MANUALLY FORWARDED TEXT IS AN AUTOMATED TELEPHONE DIALING SYSTEM IS IMPLAUSIBLE AND DOES NOT STATE A CLAIM THAT RISES ABOVE THE SPECULATIVE LEVEL.

Federal pleading requirements are well-established; courts are instructed to dismiss a complaint pursuant to FED. R. CIV. P. 12(b)(6) when the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The factual allegations pleaded in support of the plaintiff's claim "must be enough to raise the right to relief above the speculative level." *Id.* at 555; *see also Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012). That is, the allegations must "plausibly suggest," and not merely be consistent with, the alleged wrongful conduct. *Twombly*, 550 U.S. at 557. To withstand a Rule 12(b)(6) motion, the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of the cause of action." *Id.* at 555. In short, a cause of action will not survive a Rule 12(b)(6) motion (i) on the basis of "recitals of the elements of a cause of action, supported by mere conclusory statement," or (ii) where the claim lacks facial plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim of relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

The requirement that a plaintiff state a *plausible* claim is especially important in putative class actions, where defendants face the risk of potentially crippling "*in terrorem*" settlements even in cases where the validity of the alleged claims could be meritless. *See, e.g.*, *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1752 (2011) ("Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims."); *Kohen v. Pac. Inv. Mgmt. Co., LLC*, 571 F.3d 672, 677–78 (7th Cir. 2009) (recognizing "the *in terrorem* character of a class action"). Therefore, in a case like this one where the plaintiff's allegations are short on facts and reliant on irrelevant non-party (Songwhale) promotional materials, this Court should be even more vigilant in reviewing a class action complaint to ensure that Keim has pleaded enough facts to show plausible

grounds for the relief sought.  *See Twombly*, 550 U.S. at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case management' . . . .").

Separate from the fact that the Complaint does not state a plausible right to relief, Keim has not sufficiently pleaded all the elements of a TCPA claim.  For these reasons, this Court should dismiss Keim's complaint pursuant to FRCP 12(b)(6).  *See, e.g.*, *Am. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1296 (11th Cir. 2010) (affirming dismissal of claim and holding that, absent plausible allegations of actionable conduct, plaintiff failed to "nudge their claims across the line from conceivable to plausible") (internal quotations and alterations omitted).

### A.   KEIM'S ALLEGATIONS DO NOT ALLOW A REASONABLE INFERENCE THAT MESSAGES WERE SENT UTILIZING AN AUTOMATED TELEPHONE DIALING SYSTEM.

To state a TCPA text claim, the plaintiff must allege that: (i) a call was made; (ii) using an automatic telephone dialing system; (iii) the number was assigned to a cellular telephone service; and (iv) the call was not made with the prior express consent of the receiving party.  47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(1).  As noted earlier, the TCPA defines ATDS as equipment which has the capacity to both (i) store or produce telephone numbers to be called, using a random or sequential number generator *and* (ii) dial such numbers.  47 U.S.C.  § 227(a)(1).  Significantly, neither the language of the TCPA nor FCC rules and regulations implementing the TCPA have applied the statute's proscriptions to friend forwarded text messages.  Plaintiff's claims essentially ask this Court to judicially expand the TCPA to capture conduct which is beyond its scope and intent.  *See, e.g., Blount v. Rizzi*, 400 U.S. 410, 419 (1971) ("[I]t is for Congress, not this Court, to rewrite the statute."); *Friends of Everglades v. South Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) ("[W]e are not allowed to add or subtract words from a statute; we cannot rewrite it.").

Keim's allegations belie any reasonable inference that AHI used an ATDS to send friend forwarded text messages.  Specifically, Keim's allegations are inconsistent with his claim that AHI

engaged in indiscriminate, *en masse* text messaging to target him and other putative class members, which is what the TCPA was intended to combat.  Courts routinely examine the allegations of a complaint in order to determine whether they support an inference that defendant used an ATDS.  *See, e.g.*, *Knutson v. Reply!, Inc.*, No. 10-cv-1267, 2011 WL 291076, at *2 (S.D. Cal. Jan. 27, 2011) ("There is nothing in the complaint that allows the court to infer the calls were randomly generated or impersonal.").

Keim alleges, upon information and belief, that he was "involuntarily opted into the PIZZA HUT text messaging platform by some unknown party through Defendants' use of the 'Friend Forwarder' marketing campaign."  (Compl. ¶ 26.)  Implicit in this statement, however, is Keim's concession that he only began receiving such text messages as a result of the intervention of a third-party *human* intermediary who made an independent decision—perhaps at Keim's request—to forward a text to him.[18]  These allegations *defeat*, rather than support, any inference of ATDS use.  After all, the dual hallmarks of ATDS use are (i) an automated delivery system and (ii) random or sequential generation of phone numbers.  Friend forwarded texts bear none of these characteristics.

### 1. A Friend Forwarded Text Operates Manually and Does Not Require Use of an ATDS to Generate Phone Numbers.

Keim's allegations reveal that any individual who received friend forwarded text messages did so only as a result of the independent acts of another living, breathing human being.  (Compl. ¶ 26.)  If Keim was opted into the texting campaign "by some unknown party," as he himself alleges, it follows that the proximate cause of Keim's receipt of the text could not have been an ATDS, but rather the *manual* action of another person who was in possession of (or inadvertently inputted) Keim's cell phone number.  Indeed, the text messages that are the basis of this lawsuit are sent *only* upon initiation by a *person—i.e.*, after the person (the subscriber) opts-in to receive AHI text messages, makes the

---

[18]     The FCC has not defined (as of yet) "prior express consent" under the TCPA.  A subscriber cannot utilize friend forwarded texting unless he/she first *affirmatively opts in* and consents to receipt of text messages.

independent decision to forward texts that they have lawfully received to their friends, family or acquaintances, and manually those individuals' cell phone numbers.  And even then, the text messages are not sent *en masse* to millions (or even hundreds or tens) of individuals.  *See Ibey v. Taco Bell Corp.*, No. 12-cv-0583, 2012 WL 2401972, at *2 (S.D. Cal. June 18, 2012) ("The TCPA's statutory and legislative history emphasize that the statute's purpose is to prevent unsolicited automated telemarketing and *bulk* communications.") (emphasis added).

Further, AHI does not generate or supply the telephone numbers to which the friend forwarded text messages are sent.  Rather, a *third party* who has already given prior express consent to receive promotional texts is the person who supplies the friend-forwarder numbers.  (*See* Compl. ¶ 26.) Therefore, Keim's allegations of ATDS use by AHI are undermined by the fact that friend forwarded texts are only sent after the *manual inputting* of a recipient friend's cell phone number by another human being who possessed the "friend's" number and reasonably believed that friend would want to receive friend forwarded text messages.

Keim's allegations establish that neither AHI (nor any of the non-Florida defendants) indiscriminately texted Keim as part of some mass mobile marketing campaign, and hence his allegations defeat any inference that the AHI (and/or any of the non-Florida defendants) sent any text messages utilizing an ATDS.

### 2. Friend-Forwarded Texts Are Not Sent Randomly or Sequentially and Therefore Such Texts Are Outside the Scope of the TCPA's Prohibitions.

The legislative history of the TCPA indicates that "through the TCPA, Congress was attempting to alleviate a particular problem—an increasing number of *automated and prerecorded* calls to certain categories of numbers."  2003 FCC Rules, 18 FCCR at 14092 (emphasis added).  Friend forwarded text messaging, as alleged in Keim's Complaint, is outside the scope of the TCPA and its implementing regulations promulgated by the FCC.  In fact, friend forwarding is the very antithesis of random, sequential auto-dialing.  Instead, *human intervention* is the hallmark of friend forwarding.  Keim cannot

plausibly suggest that friend forwarded text messaging necessitates use of an ATDS.  *See Rules & Regulations Implementing the TCPA, Final Rule*, 68 Fed. Reg. 44144-01, ¶ 95, 2003 WL 21713245 (July 25, 2003) [hereinafter "2003 FCC Final Rule"] ("The basic function of [ATDS] equipment . . . has not changed—the capacity to dial numbers *without human intervention*.") (emphasis added).

Furthermore, the FCC has explained that calling numbers that "are not generated in a random or sequential fashion" falls outside the TCPA's prohibitions.  *See In Re Rules & Regulations Implementing the TCPA*, Report and Order, 7 FCCR 8752, 8776 (Oct. 16, 1992) (stating that the prohibitions of the TCPA "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message service (PTMDS), because the numbers called are not generated in a random or sequential fashion").  Friend forwarded text messages do not allow for random or sequential texting to pre-programmed cell phone numbers; rather, friend forwarding is wholly dependent on a human being (*i.e.*, the initial subscriber who has already given prior express consent to receive text messages) physically inputting the 10-digit number of another human being.  Such manual input is a condition precedent to any friend forwarded text message that is eventually sent.  Keim's allegations therefore indicate that the text messages he complains about would have been specific to his cell phone and not impersonal or sent *en masse* to multiple users.  The Court should accordingly dismiss Plaintiff's complaint for failure to sufficiently allege the use of an ATDS.[19]

---

[19]     Moreover, it is an open question whether the technology used to deliver text messages can *ever* constitute an ATDS.  In response to the FCC's 2010 Notice of Proposed Rulemaking, the Mobile Marketing Association ("MMA") explained in its comments that "[t]he technology used in sending mobile messages is very different that the technology used for prerecorded or live calls," and asked the FCC to recognize "the distinct method of marketing via message . . . in relation to their purpose of communicating with customers through electronic means."  *In re Rules & Regulations Implementing the TCPA*, CG Docket No. 02-278, Comments of the MMA, at 3 (May 21, 2010).

IV.     **THE TCPA'S EXEMPTION FOR CALLS MADE TO INDIVIDUALS WITH WHOM THE CALLER HAS A PERSONAL RELATIONSHIP SHOULD APPLY TO EXEMPT FRIEND FORWARDED TEXTS FROM THE TCPA'S PROSCRIPTIONS.**

Keim's claims fail even if this Court momentarily overlooks the implausible notion that friend forwarded texts utilize an ATDS because the FCC has specifically exempted such calls from the TCPA's proscriptions.  The administrative regulations governing the TCPA contain an exception to the general restrictions on telemarketing when "the telemarketer making the call has a personal relationship with the recipient of the call."  47 C.F.R. § 64.1200(c)(E)(ii).  A "personal relationship" is defined as "any family member, friend, or acquaintance of the telemarketer making the call."  *Id.* § 64.1200(f)(14).  Importantly, this exemption applies to calls (including text messages) made to wireless numbers.  *Id.* § 64.1200(e).  Since Congress delegated rulemaking authority under the TCPA to the FCC, *see* 47 U.S.C. § 227(b)(2), the FCC's exemption for commercial calls made to those with whom the caller has a personal relationship is entitled to *Chevron* deference.  *See, e.g.*, *Cremeens v. City of Montgomery*, 602 F.3d 1224, 1230 (11th Cir. 2010) ("Courts extend *Chevron* deference to an agency's permissible interpretation of an ambiguous enabling statute to the extent Congress delegated rulemaking authority to that agency.").

Keim cannot escape the necessary inference that he could not have received a friend forwarded text unless the friend who forwarded him the text knew his 10-digit cell phone number.  Right off the bat, this makes implausible Keim's allegation that he "has never provided . . . any other party with his cellular telephone number in any manner whatsoever."  (Compl. ¶ 23.)  Rather, the only logical, reasonable inference to draw is that an acquaintance of Keim's forwarded an AHI-related text to his cell phone, which would exempt any and all friend-forwarder text messages Keim received from the TCPA's prohibitions on the sending of commercial texts.[20]

---

[20]     Even if a friend forwarded text was sent to Keim inadvertently, it would still not be actionable under the TCPA because such communication would only involve transmission of a single, one-off text message, and not *en*

## V.      NO COURT HAS EVER HELD THAT RECEIPT OF A FRIEND-FORWARDER TEXT MESSAGE CONSTITUTES A VIOLATION OF THE TCPA.

Finally, it is worth pointing out that no federal court has ever held that receipt of a friend forwarded text message is sufficient to state a claim under the TCPA.  Rather, in almost every TCPA text message case where the plaintiff was found to state claim, the defendants directed the indiscriminate, mass transmission of unsolicited texts to randomly generated cell phone numbers.  *See, e.g.*, *Satterfield v. Simon & Schuster*, 569 F.3d 946 (9th Cir. 2009); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); *Buslepp v. B&B Enter., LLC*, No. 12-cv-60089, 2012 WL 1571410 (S.D. Fla. May 3, 2012).  Given the nature of the problem the TCPA's prohibitions are designed to protect against—*i.e.*, mass, indiscriminate texting to phone numbers using an auto-dialer that can randomly or sequentially generate numbers—this is not surprising.  There is nothing random or indiscriminate about friend forwarded text messages.  *See Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (*en banc*) ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to *apply* statutory language, *not rewrite it*.") (emphasis added).

The most analogous situation to the facts of the instant matter is that in which the plaintiff received a single, "confirmatory" text message.  In *Ibey v. Taco Bell Corp.*, plaintiff responded to an invitation to complete a survey about Taco Bell and voluntarily sent a text message from his cell phone to a short code.  No. 12-cv-0583, 2012 WL 241972, at *1 (S.D. Cal. June 18, 2012).  In response to his text message, plaintiff allegedly received a text message providing instructions on how to complete the survey.  *Id.* Shortly thereafter, plaintiff had second thoughts and decided to opt out by texting the word "STOP" to the same shortcode.  *Id.*   In response to the "STOP" message, plaintiff allegedly received one final text confirming that he had opted out of receiving text message notifications.  *Id.*  On these facts, plaintiff filed a class action lawsuit alleging violations of the TCPA.  *Id.*   In granting plaintiff's

---

*masse* transmissions of bulk communications.  *See Ibey v. Taco Bell Corp.*, 2012 WL 2401972, at *3 (S.D. Cal. June 18, 2012) (noting that the "spirit of the statute" is "prevention of unsolicited marketing in a bulk format").

motion to dismiss, the Court focused on the meaning of ATDS and concluded that plaintiff could not plausibly suggest that the one-time, confirmatory text was sent via an ATDS.  *See id.* at *3 ("[I]t appears to the Court that Plaintiff alleges that Defendant sent an immediate reply directly to Plaintiff.  According to Plaintiff's allegations, the text message did not appear to be random *but in direct response to Plaintiff's message*.") (emphasis added).  As in *Ibey*, Keim's allegations do not plausibly make out a TCPA claim because friend-forwarder text messages require the physical inputting of a specific number into a cell phone and thus are neither automated nor random.  Keim's Complaint should similarly be dismissed for failing to plausibly plead use of an ATDS.

## CONCLUSION

For the foregoing reasons, American Huts, Inc. respectfully requests this Court: (i) to dismiss Plaintiff Brian Keim's Class Action Complaint in its entirety and with prejudice for lack of subject matter jurisdiction pursuant to FRCP 12(b)(1); (ii) as an independent reason, to dismiss the Complaint for failure to state a plausible theory of relief under 12(b)(6); and (iii) to award such other relief this Court deems equitable and just.

**DATED:** July 27, 2012

Respectfully submitted,

**SEDGWICK LLP**
*Counsel for American Huts, Inc.*
2400 East Commercial Boulevard, Suite 1100
Fort Lauderdale, FL  33308
Telephone:      (954) 958-2500
Facsimile:      (954) 958-2513

*/s/ Moises Melendez*
MOISES MELENDEZ
Florida Bar No.: 0908835
moises.melendez@sedgwicklaw.com
CHARLES S. DAVANT
Florida Bar No. 15178
charles.davant@sedgwicklaw.com

David S. Almeida (*Admitted pro hac vice*)
David.Almeida@sedgwicklaw.com
**SEDGWICK LLP**
One North Wacker Drive, Suite 4200
Chicago, Illinois 60606
Telephone: (312) 641-9050
Facsimile: (312) 641-9530

*Counsel for American Huts, Inc.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 27th day of July, 2012, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day to Scott D. Owens, Esq., 664 E. Hallandale Beach Blvd., Hallandale, FL 33009, via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Moises Melendez*
     Moises Melendez