# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.  9:12-cv-80577-KAM

BRIAN KEIM, an individual, on behalf
of himself and all others similarly situated,

     Plaintiff,

v.                               **COMPLAINT - CLASS ACTION**


 ADF MIDATLANTIC, LLC, a foreign limited liability company,
AMERICAN HUTS, INC., a foreign corporation,
ADF PIZZA I, LLC, a foreign limited liability company,
ADF PA, LLC, a foreign limited liability company,
(known collectively as "ADF COMPANIES"), and
PIZZA HUT, INC., a foreign corporation,

     Defendants.
_____/

## SECOND AMENDED CLASS ACTION COMPLAINT FOR STATUTORY DAMAGES AND INJUNCTIVE RELIEF UNDER 47 U.S.C. § 227 *et seq.*, THE TELEPHONE CONSUMER PROTECTION ACT
### JURY DEMAND

    1.    Plaintiff, Brian Keim, brings this action for damages and other legal

and equitable remedies as a result of  the illegal actions of  ADF Midatlantic, LLC,

American Huts, Inc., ADF Pizza I, LLC, ADF PA, LLC, (Known Collectively As

"ADF Companies"), and Pizza Hut, Inc., (collectively Defendants) in sending

unsolicited survey messages to Plaintiff's cellular telephone in direct contravention

to the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. (hereinafter referred to as the "TCPA")

2.     Consumer complaints about abuses of telephone technology that invaded consumers privacy prompted Congress to pass the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 *et seq. Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

3.     In an effort to drum up business and increase their bottom line, Defendants sent out thousands of unwanted text messages in violation of the TCPA.  By effectuating these unauthorized text message calls (also known as "SMS Messages"), Defendants have caused consumers actual harm, not only because consumers were subjected to the aggravation that necessarily accompanies mobile spam, but also because consumers frequently have to pay their cell phone service providers for the receipt of such spam and the recipients of such spam incur actual damages, such as diminished cellular battery life, loss of data storage capacity, invasion of privacy, and intrusion upon seclusion.

4.     In order to redress these injuries, Plaintiff, on behalf of himself and the proposed class of similarly situated individuals, brings this suit under the TCPA, which specifically prohibits unsolicited text calls to cell phones. Defendants have caused to be published commercial advertisements in a manner which violates the right of privacy of the putative class members.  On behalf of the

2

class, Plaintiff seeks an injunction requiring Defendants to cease all such commercial text advertisements and an award of statutory damages to the class members, together with costs.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this class action lawsuit under 28 U.S.C. § 1331, 28 U.S.C. § 1332(d), and 47 U.S.C. § 227.  Venue in this District is proper because Plaintiff resides here and Defendants either conduct business in this District or have caused to be placed calls into this district. This Court also has jurisdiction over Plaintiff's individual claim pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227.

## PARTIES

6.     Plaintiff, Brian Keim ("Plaintiff" or "Mr. Keim"), is a natural person, and citizen of the State of Florida, residing in Palm Beach County, Florida. Mr. Keim is the subscriber to the cellular telephone which received unwanted text message spam as further described herein.

7.     Defendant ADF Midatlantic, LLC is a foreign limited liability company, which owns and operates Pizza Hut franchises and other restaurants in several states, including the following: Virginia, West Virginia, Maryland, and the District of Colombia.

8.     Defendant American Huts, Inc. is a foreign corporation, which owns and operates Pizza Hut franchises and other restaurants in several states, including the following: Tennessee, Florida, Georgia, and Alabama.

9.     Defendant ADF Pizza I, LLC is a foreign limited liability company, which owns and operates Pizza Hut franchises and other restaurants in several states, including the following: New York, New Jersey, and Connecticut.

10.     Defendant ADF PA, LLC is a foreign limited liability company, which owns and operates Pizza Hut franchises and other restaurants in the Commonwealth of Pennsylvania.

11.     The four aforementioned Defendants hold themselves out to the public as one entity referred to collectively as "ADF Companies."

12.     ADF Companies jointly maintain a single website to market its stores. *See* www.ADFCompanies.com.  ADF Companies has a restaurant locator function that, as of June 8, 2015, lists at least two dozen ADF Company Pizza Hut stores in Florida.  The contact us page provides an address for "ADF Companies" at 350 Passaic Avenue, Second Floor, Fairfield, New Jersey 07004.

13.     According to ADF Companies LinkedIn page:

> ADF Companies is the second largest Pizza Hut franchisee in the world and the 3rd largest YUM brands operator. Incorporated in 1998, ADF Companies has grown from operating 20 restaurants to more than 300 today.   And,   ADF Companies continues to grow and acquire new assets. The

4

strong leadership team has over 100 years of combined multi-unit restaurant operational and development experience. Today, ADF owns and operates several hundred YUM restaurants in eleven states under franchise agreements with Pizza Hut, KFC, Taco Bell, and Panera Bread.

https://www.linkedin.com/company/adf-companies-llc?trk=prof-following-company-logo.   Last visited June 8, 2015.

14.   ADF Companies jointly markets its stores and ADF Companies employs one marketing director for all stores including the stores owned by the four aforementioned Defendants.

https://www.linkedin.com/profile/view?id=423548560&authType=name&authToken=GjgF&trk=prof-sb-browse_map-name.

15.   At the very least, ADF Companies is a joint venture to manage and market the hundreds of Pizza Hut Franchises, including the stores for each of the named four franchisee Defendants.

16.   As joint ventures, ADF Midatlantic, LLC, American Huts, Inc., ADF Pizza I, LLC, ADF Pa, LLC, are jointly and severally liable for the actions of ADF Companies in sending the texts at issue.

17.   Pizza Hut, Inc. is a restaurant chain and international franchise with more than 6,000 stores located in the United States, including those operated by the ADF Companies. Pizza Hut is a registered corporation the State of Delaware,

5

operating from headquarters located at 7100 Corporate Drive, Plano, Texas 75024, and is therefore a corporate citizen of both Delaware and Texas.

18.     Songwhale, LLC ("Songwhale") is a text message marketing company, which was hired by ADF Companies and approved or authorized by Pizza Hut, Inc. to promote the Pizza Hut brand.  Songwhale is a registered limited liability company in the State of Minnesota, operating from offices located at 100 43rd Street, Suite 115, Pittsburgh, Pennsylvania 15201.  Songwhale is a citizen of Minnesota and Pennsylvania, and upon information and belief, all of its members are citizens of either Minnesota or Pennsylvania.

19.     Cellit, LLC ("Cellit") is also a text message marketing company, which was hired by ADF Companies only after having been approved or authorized by Pizza Hut, Inc.  to promote Pizza Hut or other restaurants.  Cellit is a registered limited liability company in the State of Arizona, operating from offices located at 213 W. Institute Place, Suite 603, Chicago, Illinois 60610. Cellit is a citizen of Arizona and Illinois, and upon information and belief, all of its members are citizens of either Arizona or Illinois.

## BRIEF OVERVIEW OF TEXT MESSAGING AND THE TCPA

20.     In recent years, marketers who often have felt stymied by federal laws limiting solicitation by telephone, facsimile machine, and e-mail have increasingly looked to alternative technologies through which to send bulk solicitations cheaply.

21.     One of the newest types of such bulk marketing is to advertise through Short Message Services.  The term "Short Message Service" or "SMS" describes a messaging system that allows cellular telephone subscribers to use their cellular telephones to send and receive short text messages, usually limited to 120 - 500 characters.

22.     An "SMS message" is a text message call directed to a wireless device through the use of the telephone number assigned to the device.  When an SMS message call is successfully made, the targeted consumer's cell phone rings, alerting him or her that a call is being received.

23.     Unlike more conventional advertisements, SMS calls, and particularly wireless or mobile spam, can actually cost their targeted consumers money, because cell phone users must frequently pay their respective wireless service providers either for each text message call they receive or incur a usage allocation deduction to their text plan, regardless of whether or not the message is authorized.

24.     Most commercial SMS messages are sent from "short codes" (also known as "short numbers"), which are special cellular telephone exchanges, typically only five or six digit extensions, that can be used to address SMS messages to mobile phones.  Short codes are generally easier to remember and are utilized by consumers to subscribe to such services such as television program voting or more benevolent uses, such as making charitable donations.

25.    A short code is sent to consumers along with the actual text message and conclusively reveals the originator of the SMS message.

*26.*    According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).

27.    Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendant to demonstrate that Plaintiff provided express consent within the meaning of the statute.  *See FCC Declaratory Ruling*, 23 F.C.C.R. at 565 (¶ 10).

28.    Text messages are "calls" within the context of the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009).

29.    One of the leading trade groups on mobile marketing, the Mobile Marketing Association, publishes guidelines for text message campaigns, which requires that every commercial SMS message include an unsubscribe mechanism.

*See* Mobile Marketing Association Global Code of Conduct available at http://mmaglobal.com/policies ("Mobile Marketers must implement a simple termination (opt-out) process so that users can stop receiving messages, and users must be able to exercise their opt-out choice from any message.").

30.     Pursuant to a recent ruling from the FCC on the issue of vicarious liability, "a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *See* FCC Declaratory Ruling, CG Dkt. No. 11-50, FCC 13-54, ¶ 28 (May 9, 2013).

## THE "FRIEND FORWARDER" MARKETING PROGRAM

31.     At some point in 2009, ADF Companies hired Songwhale to assist with its text message marketing efforts.

32.     Songwhale implemented a "viral" text messaging campaign wherein people were encouraged to forward the cellular telephone numbers of their friends to Songwhale by texting a cellular telephone number to a short code operated by Songwhale; in exchange, the party relaying the cellular telephone number to Songwhale would receive a coupon for free food and/or discounts redeemable at local Pizza Hut restaurants – not limited to Pizza Hut stores operated by ADF Companies.

33.     The cellular telephone number sent to Songwhale was then automatically stored in Songwhale's text messaging database via Songwhale's software program. These numbers were not entered into Songwhale's database via humans.

34.     Defendants knew it did not have consent to text Plaintiff or the putative class because Defendants knew that the numbers in the Songwhale database all came from third parties.

35.     Songwhale's dialing system would then send telemarketing texts *en masse* to the putative class by dialing the cellular telephones from its database. Humans did not dial these numbers, but instead these numbers were automatically dialed by Songwhale's dialing platform from the pre-programmed list of numbers stored in it.

36.     The above-described messages came from the short code "94253"[1], which belonged to Songwhale at all relevant times.  The fact that the call came from a short code is further indication that it was placed without human intervention.  Humans do not have cellular telephones with short codes, which are special cellular telephone exchanges.

37.     These messages are not "friend forwarded," nor sent one to one - sender to recipient, nor sent from any application downloaded by any third party,

---

[1] "94253" spells out the word "WHALE" alphanumerically when using a standard telephone keypad.

nor part of any group text, nor from any human but instead were sent from Songwhale's dialing platform where the called number came from Songwhale's database in many instances months after being automatically entered into Songwhale's database.

38.    The texts were not sent at the affirmative direction of the third parties who provided Plaintiff or the putative class' numbers to Defendant.  Instead, these third parties had no control or involvement in the manner, timing or content of the texts at issue.

39.    The text message marketing program indeed went viral. In fact, one individual on the website YouTube posted a video stating, "Pizza Hut back in the Midwest just ran a mobile marketing campaign … they had a friend feature where you could forward it to a friend and get more prizes for doing that…." Source: https://www.youtube.com/watch?v=n5K7zgDTuaQ (last visited on March 23, 2015).  ADF Companies does not operate any stores in the Midwestern United States.

40.    According to Songwhale, in April 2009, using the "Friend Forwarder" marketing scheme, more than 2,000 people were opted into the Pizza Hut text messaging platform over a thirty (30) day period. An exhibit produced by Songwhale explaining the inner workings of the "Friend Forwarder" program is attached hereto as **Exhibit A** (*See* pp. 9, 15-16).

41.     According   to   a   May   11,   2011   article   appearing   on
Blogtrepreneur.com, the following exchange took place between Ty Morse, Chief
Executive Officer of Songwhale, and Luke Etheridge, a reporter at the aforesaid
website:

> **Luke:** Yeah, yeah. I mean what you mentioned earlier
> is the fact that you need a database to obviously, to
> text, to send SMS to. But how do you actually go
> about collecting a database? Is their [*sic*] clever
> ways that you can do that? Is their [*sic*] a way that
> you can do it from zero and do it quickly as well?
>
> **Ty:** Yeah, so we've built out ways to grow databases
> virally. And one of the main things we built out that's
> been incredibly successful, is called Friend Forwarder.
>
> And what we do is, let me give you an example with
> Pizza Hut. We'll run a TV spot with Pizza Hut that
> says "Text to win pizza for a year". You text in and
> the bounce-back says "Thanks for participating.
> Winner will be [indecipherable 20:19] in two weeks.
> Here's free breadsticks for participating.
>
> Forward these free breadsticks to five of your friends
> and we'll give you a free soda. Forward these free

12

breadsticks to ten of your friends; we'll give you a free pizza."

Well everybody wants the free pizza. So everybody forwards it to ten of their friends and then the ten friends that got forwarded get the same text message. Here's breadsticks, forward this to five friends, we'll give you a soda, forward it to ten, we'll give you a free pizza.

So you actually have your patrons growing the database for you. And why, cuz you're giving them a great offer. And so they want to forward it because they want to have that great offer.

So it's important to have a great user experience that's giving a valuable prize and then that allows us to use that incentive to virally grow the database very quickly and we call those acquisition campaigns.

So you have a kind of a high-end prize which would be a large pizza and everybody wants to have that high-end prize and so they're forwarding the message. It virally grows, that's the acquisition campaign.

Then you start once you have a large enough database, you have retention campaigns. Now we've been very fortunate, we've developed a formula where an average of over ninety percent retention rate. Meaning yeah, you get a little bit degradation of people opting out every month but we always get people opting in as well.

So we retain over ninety percent of the members of our database. It's a cross all of our, whether it's Pizza Hut or sports teams or whatever it is. And so then you use your retention campaign, that keeps them interested.

The offer might be not as rich but it's good enough to allow the messaging in the pocket. What we don't allow our partners to do is say "Hey, come to Pizza Hut." Well, I don't want a text message in my pocket that genuinely says "Come to Pizza Hut." I want some value there.

So we've used methods like the Friend Forwarder. We really grow mobile databases. Now we also have our own television platform, so we're an exclusive mobile provider for several channel positions in the

14

US, whether it's on satellite TV or whether it's on local or regionalized TV that goes through cable.

We actually control channel positions where we can show and say there's a cooking show on, so it's food. Well, we'll put "contextual" at the bottom, we'll say, we'll put a banner at the bottom while the show is running and we'll say "Hungry? Text Pizza Hut to nine-four-two-five-three".

Well, Pizza Hut knows that the mobile user has a higher average order and a higher frequency. So what we're doing is, we're driving people to become part of Pizza Hut's mobile program and we're using our own television space to do that. So these are some very effective methods to grow databases quickly.

Source:   http://www.blogtrepreneur.com/2011/05/11/ty-morse-interview-ceo-of-songwhale-revolutionizing-sms-marketing/

(last visited on March 3, 2012).

42.   All subject cellular telephone numbers obtained by Songwhale were later used in a second *national* Pizza Hut text messaging campaign utilizing the short code "30364" by a different mobile marketer named at the time, Cellit.  Cellit

sent out text message advertisements on behalf of both ADF Companies and Pizza Hut, Inc. to promote the Pizza Hut brand across the United States.

43.     Pizza Hut, Inc., through the International Pizza Hut Franchise Holders Association (IPHFHA), maintains a national advertising committee which oversees its franchisees and "determine[s] and control[s] the amount, kind, and quality of national advertising and sales promotion to be provided … for Pizza Hut and its franchisees."

Source:     http://uwf.edu/hbettisoutland/Case%20Studies/Pizza%20Hut%20Inc.pdf (last visited on March 23, 2015).

44.     In another publication, which analyzed the initial results of the Pizza Hut "Friend Forwarder" program, it stated that "Pizza Hut is planning to continue to use SMS and will be launching a national campaign." Source: http://cellmarketinggroup.com/case-studies/case-studies-that-prove-it (last visited on March 3, 2012).

45.     Pizza Hut is either directly liable for the text messages in this case because the texts were sent as part of its national campaign, or at the least, is vicariously liable because ADF companies acted as agent in promoting Pizza Hut and Pizza Hut Inc. controlled or had the right to control the manner and means of the text message campaign conducted.

## FACTUAL ALLEGATIONS SPECIFIC TO MR. KEIM

46.     Plaintiff has never provided Pizza Hut, Songwhale, Cellit or ADF Companies with his cellular telephone number in any manner whatsoever.

47.     Irrespective of having no prior relationship with Defendants, Plaintiff began receiving unwanted commercial text messages from Defendants starting on or about February 2011; this practice is commonly referred to as "mobile spamming."   Some examples of the text messages sent by Defendant are as referenced below:

[On or about November 30, 2011 from short code "94253"]

```
PIZZAHUT!  Fly  into  Pizza  Hut  for  WING
WEDNESDAY- Wings are just $.50 each (minimum8)
Add Pepsi and breadsticks for $5 more!
```

[On or about January 12, 2012 from short code "30364"]

```
To receive great weekly mobile offers from your
local Pizza Hut...reply YES now! Msg/data rates
may  apply.  U  may  receive  up  to  4  mobile
offers/mo.
```

48.     Identical text messages were sent to Mr.  Keim and the other putative class members by Defendants via their mobile marketers *en masse* using an automatic telephone dialing system, also known as an "auto-dialer"; the auto-dialer used had the capacity to store or produce telephone numbers to be called using a

random or sequential number generator as well as dial from lists in its database and to dial such numbers.

49. As can be seen from the November 30, 2011 text, the promotion was not limited to local Pizza Huts, but instead applied to all Pizza Huts operated by all of these Defendants.

50. The telemarketing text messages sent by Defendants or parties authorized to send text messages on Defendants' behalf do not provide any instructions as to how one might opt out from receiving future text messages.

## CLASS ACTION ALLEGATIONS

51. This action is brought on behalf of a class consisting of (i) all persons in the United States; (ii) who received text messages from Defendants or parties authorized to send text messages on behalf of Defendants; (iii) wherein the cellular telephone was provided by a third party; (v) and said text messages were sent using an automatic telephone dialing system or a device which has the capacity be used as same; (vi) during the four year period prior to the filing of the original complaint in this action through the date of certification.

52. The above-cited class definition excludes all persons who were self-subscribed to Defendants' text message advertising program through other marketing efforts. Excluded from the Class are Defendants, their legal representatives, assigns, and successors, and any entity in which the Defendants

18

have a controlling interest.  Also excluded from the Class is the Judge to whom this case is assigned as well as the Judge's immediate family.  Plaintiff reserves the right to amend the above-stated Class definition based upon facts learned in discovery.

53.     Plaintiff alleges on information, belief, and the exhibit attached hereto that the class is so numerous that joinder of all members of the class is impractical. There are more than forty-one (41) individuals in the Class as previously defined herein.

54.     There are questions of law or fact common to the class, which common issues predominate over any issues involving only individual class members.  The common factual and/or legal issues common to each class member are as follows:

(1)    Whether Defendants' conduct is governed by the TCPA?

(2)    Whether Defendants had consent to send texts to Plaintiff and the putative class?

(3)    Whether the mobile spam sent by Defendants violated the TCPA?

(4)    Are the class members entitled to treble damages based upon the willfulness of Defendants' conduct?

19

(5)     Whether Defendants should be enjoined from engaging in such

conduct in the future?

55.     Plaintiff's claim is typical of those of the class members.  All claims are based on the same facts and legal theories.

56.     Plaintiff will fairly and adequately protect the interests of the class. He has retained counsel experienced in handling actions involving unlawful practices under the TCPA and class actions.  Neither Plaintiff nor his counsel has any interests which might cause them not to vigorously pursue this action.

57.     Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

(1)     The questions of law or fact common to the members of the class predominate over any questions affecting an individual member.

(2)     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

58.     Certification of a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is also appropriate in that Defendants have acted on grounds generally applicable to the class thereby making appropriate relief with respect to the class as a whole.

59.     Mr. Keim requests certification of a hybrid class under Rule 23(b)(3), Federal Rules of Civil Procedure, for monetary damages and pursuant to Rule 23(b)(2) for injunctive relief.

**COUNT I**
**NEGLIGENT VIOLATIONS OF THE**
**TELEPHONE CONSUMER PROTECTION ACT**

60.     Plaintiff incorporates the above factual allegations.

61.     Defendants made unsolicited telemarketing text calls to the putative class using an automatic telephone dialing system.

62.     The calls were made without the prior express consent of the targeted consumers and neither Plaintiff nor the putative class provided their cellular telephone numbers to Defendants or their mobile marketers.

63.     The aforesaid calls were made in violation of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii).

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and in favor of the Class, and against Defendants for:

(1)     An order certifying this case to proceed as a class action;

(2)     Statutory damages at $500 dollars per call for negligent violations of the TCPA;

(3)     An injunction requiring Defendants to cease all communications in violation of the TCPA; and

21

64.     Such further relief as this Court may deem appropriate.

## COUNT II
## WILLFUL VIOLATIONS OF THE
## TELEPHONE CONSUMER PROTECTION ACT

65.     Plaintiff incorporates the above factual allegations.

66.     Defendants made unsolicited telemarketing text calls to Plaintiff and members of the putative class using an automatic telephone dialing system.

67.     The calls were made even though Defendants knew that all of the numbers were provided by third parties and they did not have consent from a Plaintiff or any putative class member.

68.     The aforesaid calls were made in violation of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii).

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and in favor of the Class, and against Defendants for:

(1)     An order certifying this case to proceed as a class action;

(2)     Statutory damages of up to $1500 dollars per call for each willful violation of the TCPA;

(3)     An injunction requiring Defendants to cease all communications in violation of the TCPA; and

(4)     Such further relief as this Court may deem appropriate.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated this 10th day of June 2015.

Respectfully submitted,

SCOTT D. OWENS, ESQ.
SCOTT D. OWENS, P.A.
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Phone: 954-589-0588
Fax: 954-337-0666
Email: Scott@ScottDOwens.com

By: */s/ Scott D. Owens*
Scott D. Owens, Esq.
Florida Bar No. 0597651

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 10, 2015 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this date in some other authorized manner for those counsel or parties, if any, who are not authorized to receive electronically Notices of Electronic Filing.

By: */s/ Scott D. Owens*
Scott D. Owens, Esq.

23