# EXHIBIT Q

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| BRIAN KEIM, an individual, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No.  9:12-cv-80577 |
| v. | ) ) | Hon. Judge Kenneth A. Marra |
| ADF MIDATLANTIC, LLC, a foreign limited liability company, | ) ) | Magistrate Judge William Matthewman |
| AMERICAN HUTS INC., a foreign corporation, | ) ) ) | |
| ADF PIZZA I, LLC, a foreign limited liability company, | ) ) | |
| ADF PA, LLC, a foreign limited liability company, and | ) ) | |
| PIZZA HUT, INC., a foreign corporation | ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' RULE 26(a)(2) EXPERT DISCLOSURE**

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Defendants ADF Midatlantic, LLC, American Huts Inc., ADF Pizza I, LLC, ADF PA, LLC and Pizza Hut, Inc., by and through undersigned counsel, set forth the following as their Rule 26(a)(2) disclosures.

**I.      INTRODUCTORY STATEMENT**

These disclosures are based upon information reasonably available to Defendants at this time.  Defendants reserve the right to supplement or to amend these disclosures at any time, should additional information become available.  These disclosures represent Defendants' good faith effort, to date, to identify information subject to the disclosure requirements of Fed. R. Civ. P. 26(a)(2).   All of the disclosures set forth below are made subject to these qualifications.

**II.     DISCLOSURES**

Subject to the foregoing Introductory Statement, Defendants discloses the following information:

1.      Defendants disclose Kenneth R. Sponsler, whom they may use as an expert at trial to present evidence.

2.      A complete statement of all opinions Mr. Sponsler will express and the basis and reasons for them—as well as the facts and data considered by Mr. Sponsler in reaching those opinions—is attached hereto as Exhibit A.

3.      Mr. Sponsler's qualifications are set forth in his curriculum vitae, which is attached to Mr. Sponsler's expert report.  Mr. Sponsler's qualifications are also set forth in his background, attached hereto as Exhibit B.

4.      A list of all cases in which Mr. Sponsler has testified as an expert at trial or by deposition in the last four years is set forth in Exhibit B as well as his summary of expertise, attached hereto as Exhibit C.

5.      Mr. Sponsler's fee in this case is $500 per hour for report preparation and drafting, $700 per hour for deposition testimony and $1,000 per hour for courtroom testimony.

Dated:  December 6, 2016                    */s/ David S. Almeida*

David S. Almeida, Esq. (*admitted pro hac vice*)
dalmeida@sheppardmullin.com
Mark S. Eisen, Esq. (*admitted pro hac vice*)
meisen@sheppardmullin.com
**SHEPPARD, MULLIN,
RICHTER & HAMPTON** LLP
70 West Madison Street, 48th Floor
Chicago, Illinois  60602
Telephone:  (312) 499-6300
Facsimile:  (312) 499-6301

David V. King, Esq.
dking@kingchaves.com
**KING & CHAVES, LLC**
444 W. Railroad Ave., Suite 400
West Palm Beach, FL  33401
Telephone:  (561) 835-6775
Fax:  (561) 835-6774
Florida Bar No.:  438200

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that a true and correct copy of the foregoing **DEFENDANTS' RULE 26(a)(2) EXPERT DISCLOSURE** was served upon the following counsel of record via email and U.S. Mail this 6th day of December, 2016:.

Amy L. Wells
awells@keoghlaw.com
Keogh Law, LTD
55 W. Monroe Street
Suite 3390
Chicago, IL 60603

Scott David Owens
scott@scottdowens.com
SCOTT D. OWENS, P.A.
3800 S. Ocean Drive
Suite 235
Hollywood, FL 33019

/s/ *David Almeida*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

BRIAN KEIM, an individual, on behalf of himself
and all others similarly situated,

                      Plaintiff,

     vs.

ADF MIDATLANTIC, LLC,
AMERICAN HUTS Inc.,
ADF PIZZA I, LLC,
ADF PA, LLC and
PIZZA HUT, Inc.

                  Defendants.

Case No.
9:12-cv-80577-KAM

EXPERT REPORT
BY KEN SPONSLER

1.      I am the Senior Vice President and General Manager of CompliancePoint, Inc.'s ("CompliancePoint") Customer Engagement compliance practice. CompliancePoint is a global professional services firm specializing in consumer contact compliance consulting and audit services, located in Duluth, Georgia.

2.      I was contacted by Mark S. Eisen of Sheppard Mullin Richter & Hampton LLP, co-counsel for the Defendants, ADF Midatlantic, LLC, American Huts Inc., ADF Pizza, LLC (collectively, the "ADF Defendants"), and Pizza Hut, Inc., in the case captioned as *Keim v. ADF Midatlantic, et al.*, Case No. 9:12-cv-80577 (S.D. Fla.) to assess the ability to ascertain the putative class members in this case and also provide my own opinions concerning the availability of data with which one could reliably and accurately identify the names and addresses of the subscribers and authorized users of telephone numbers at a specific time in the past, if one has only the telephone number, the telephone company name, and the date of dial associated with each number.

3.      I have reached the conclusions below based on my expertise and experience in the telecommunications industry as well as my review of the materials listed in paragraph 18.

## I.     Qualifications

4.     I have over sixteen years of operational experience in business-to-business and business-to-consumer global consumer contact compliance matters. These matters include consumer contacts through telemarketing (inbound and outbound), SMS/Texts, Mobile Service Commercial Messages (MSCM), prerecorded messages, email, fax as well as mail. My experience includes consumer contacts for the purposes of marketing, debt collection, informational or service purposes. I have specific expertise in all matters related to the use of Automatic Telephone Dialing Systems (ATDS) including required express or written express consent, revocation of consent, wrong party contacts as well as historical identification of mobile telephone users or subscribers. I have personally conducted dozens of onsite compliance assessments, gap analyses, and risk assessment studies. I have provided expert reports in several TCPA-related matters, including issues specifically related to identifying authorized users of mobile telephones. My consulting practice, CompliancePoint CE, also provides historical call data compliance and wireless identification services on behalf of law firms and corporate clients. CompliancePoint Inc.'s parent company, PossibleNOW, Inc., is a provider of marketer compliance technologies, including mobile telephone identity services. A copy of my current CV is attached as **Exhibit A**, which contains the publications I have authored in the last ten years, and a list of all cases in which, during the last four years, I have testified at trial or in a deposition. I am being compensated for my work preparing this report at my standard expert rate of $500 per hour. My compensation is not dependent upon the outcome of this matter.

5.     My familiarity with consumer contact compliance industry standards began in early 2000. After my transition from 27 years of military service, I worked as a project manager for the development of a software product called, "The DNCSolution". This product enables sellers and telemarketers to comply with federal and state Do Not Call laws by allowing companies to check calling campaign lists against all federal and state Do Not Call lists, company-specific Do Not Call lists, as well as wireless lists. My work on this project led to my study of federal and state Do Not Call laws as well as exemption criteria. As the "DNCSolution" product evolved to comply with more restrictive state laws, I realized the need for a consultative service, and started a compliance consulting practice in 2005 to help clients understand how these laws applied to them.

EXPERT REPORT OF KEN SPONSLER

6.      My compliance consulting practice revolves around assisting sellers, service providers, and other related third parties to understand consumer contact standards and regulations and to implement operational procedures to ensure compliance with such standards and regulations. I have developed practices, systems, and training to ensure such compliance. These include compliance officer training programs, call data compliance audits, as well as seller-service bureau risk mitigation consulting.

7.      My consulting practice monitors ever-changing federal and state regulatory requirements, as well as civil actions and published materials from industry experts. My years of experience in these matters involve a host of industry verticals such as financial services, insurance, retail, home alarm services, satellite and cable services, teleservices, vacation and cruise lines, lead generation, and the career college industries. I provide compliance retainer services for over five dozen firms, including several fortune 500 companies.

8       I have assisted many clients to implement compliance standards in various due diligence areas including the development of:

- Corporate compliance governance procedures
- Compliance review committee charters
- Compliance policy and procedure manuals
- Compliance training and testing materials
- Escalation policy and procedure
- Critical task risk assessment analysis
- Agent quality assurance and compliance monitoring methodologies
- Compliance, recordkeeping and monitoring and enforcement contractual provisions

9.      I have provided training and instructions relative to consumer contact compliance in the following circumstances:

- Direct to consumer marketing compliance officer training courses for compliance staff and corporate legal departments
- Call center agent training regarding corporate Do Not Call policies
- College campus admissions representative training regarding telemarketing and corporate compliance
- Customer compliance awareness training for dialer technology providers

EXPERT REPORT OF KEN SPONSLER

- Trade association compliance seminar presentations.

10.     Additionally, I have been retained to monitor compliance with court orders or settlements in the following instances:

- Monthly post-call data and call abandonment audit analysis and reporting
- Ongoing announced and unannounced call center audits
- Consumer call attempts monitoring to prevent over-dialing
- Call time restriction compliance monitoring
- Admissions agent truthful disclosure monitoring.

11.     I provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. I have undergone specialized training at the U.S. Army Command Sergeant Major Course (Graduated with Honors) and the Advanced Non-Commissioned Officers' Course (Distinguished Graduate). I retired from the U.S. Military after achieving the highest enlisted rank of U.S. Army Command Sergeant Major, of the 3rd Infantry Division, a 23,400-man elite combat team.

12.     On a regular basis, I conduct compliance-related webinar presentations to PossibleNOW and CompliancePoint customers regarding operational compliance subject matter such as:

- Compliance with the TCPA final rules regarding calls/texts to wireless numbers
- Federal and state enforcement and settlement action lessons learned
- Changes to federal and state consumer contact laws
- Global compliance and privacy updates
- Trends in the mobile marketplace
- Do Not Call and Call Abandonment safe harbor compliance
- Telemarketer registration and bonding requirements
- Do Not Call compliance data auditing lessons learned
- Record keeping lessons learned from the Civil Investigative Demand
- Federal and state established business relationship exemption criteria
- Call time restriction compliance
- Federal and state disclosure requirements

EXPERT REPORT OF KEN SPONSLER

- How to prepare and respond to federal and state investigative demands.

13. As a member of the National Board of Directors for the Professional Association of Customer Engagement (PACE formerly the American Teleservices Association), I interact with hundreds of corporate compliance professionals and companies/providers involved in consumer contact operations.

14. I have been asked to provide presentations and colloquies and am a frequent speaker at industry events, including but not limited to: PACE Annual Convention and Washington Summit; Direct Marketing Association Teleservices Conference; College of Information Assurance Professional's Governance; Risk and Compliance Summit; Noble Users' Conference; The Association of Private Sector Colleges and Universities Annual Conference (APSCU); The Customer Engagement Management (CEM) Conference; Dish Network's Annual Retailer Conference; Campus Management Corporation (CMC) Annual Conference; Life Office Management Association (LOMA); Quarterly Compliance Focused Webinar Presentations; LeadsCon annual conference; and the Allied Solutions financial services member conference.

15. I hold the following Registrations, Licenses, and Certifications: Customer Engagement Certified Professional (CECP) by the Professional Association for Customer Engagement (PACE); Certified Information Privacy Professional (CIPP/US) by the International Association of Privacy Professionals (IAPP); and Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO).

16. I have received the following professional recognition for my work in this field:

    a. PACE 2016 Pioneer Award. This award is presented annually to a member who has demonstrated pioneering thought leadership and commitment to the goals of the association and the industry. I received this award for the development of the Customer Engagement Compliance Professional Certification (CECP) program. This professional certification provides education and standards for the consumer contact compliance professional, including corporate compliance officers and attorneys. To date, over seventy professionals have earned certification after participating in the extensive study program and subsequently successfully passing a comprehensive two-hour examination. The certification is awarded by the Professional Association of Customer Engagement (PACE).

EXPERT REPORT OF KEN SPONSLER

b.  Technovation Award awarded by American Teleservices Association (ATA), 2010. The ATA (now PACE) is a national trade organization for the contact center industry. Each year, the organization awards the "Technovation Award for the most significant product or service that benefits the goals of the association and the contact center industry." My consulting practice received this award for our development of the call data compliance audit program. This program involves monthly call data compliance audits of call centers. Call centers participating in the audits showed significantly reduced non-compliant outbound calls. This is accomplished by immediately identifying anomalies and the causes of the error as well as the implementation of remediation procedures to prevent future errors.

c.  PACE Chairman's Award for Leadership (2014).

d.  Hewlett Packard Vendor of the Quarter Award (to CompliancePoint), 2007. Hewlett Packard awarded this distinction to CompliancePoint as a result of the quality and value of our compliance assessment and retainer services.

e.  Eighteen separate personal awards by the U.S. Army, including the Legion of Merit.

## II.   Summary of Expert Experience

17.     In the last four years, I have been qualified as an expert in Federal District Court and have been retained to provide deposition testimony as an expert in the following matters:

*Manno v. Healthcare Revenue Recovery Group, No. 11-cv-61357 (S.D. Fla.); United States of America v. DISH Network, No. 3:09-cv-03070 (C.D. Ill.); Trilegiant Corp. v. Sitel Corp., No. 1:2009-cv-06492 (S.D. N.Y.); ADT Security Svcs. v. Security One International, No. 11-cv-05149 (N.D. Cal.); Horton v. Cavalry Portfolio Svcs., No. 3:13-cv-00307-JAH-WVG (S.D. Cal.); Shamann v. Monex Credit Co., Arbitration Proceeding JAMS Reg. 1200041941; Molnar v. NCO Financial Systems, Inc., Nos. 3:13-cv-00131 and 3-13-cv-00685 (S.D. Cal.); Hooker v. Sirius XM, No. 13-cv-0003 (E.D. Va.); True Health Chiropractic, Inc. v. McKesson Corp., No. 13-cv-02219 (N.D. Cal.); Bridge v. Credit One Bank, No. 2:14-cv-01512 (D. Nev.);* and *Raffin v. Medicredit, Inc., No. 2:15-cv-04912 (C.D. Cal.).*

I provided trial testimony in federal court in the matters *United States of America v. DISH Network*, No. 3:09-cv-03070 (C.D. Ill.) and *ADT Security Services Inc., v. Security One International*, No. 11-cv-05149 (N.D. Cal.).

18.    Materials reviewed and relied upon:

In forming my opinions, I have reviewed various documents made available to me by counsel and the ADF Defendants that were utilized during the putative class period, including the Second Amended Class Action Complaint *Keim v. ADF Midatlantic, LLC* filed June 10, 2015; spreadsheet Bates No. AHI 0005285; spreadsheet Bates No. AHI 0005290; CARES Data Bates Nos. AHI 0005672 to AHI 0005746. Additionally, I reviewed the LexisNexis® Phone Ownership Identification marketing literature; Notice of Ex Parte – CG Docket No. 02-278 Wells Fargo dated July 31, 2014; Comments of CTIA – The Wireless Association at 4, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; *Petition for Expedited Declaratory Ruling of United Healthcare Services, Inc.*, CG Docket No. 02-278 (filed Jan. 16, 2014)); *Petition for Rulemaking of ACA International*, CG Docket No. 02-278 (filed Jan. 31, 2014; and *Comments of ACA International*, CG Docket No. 02-278 (filed Mar. 24, 2014).

### III.    Methodology

25.    In drafting this report and rendering my opinions in this case, I considered the above documents made available to me by the ADF Defendants. I further relied on my experience in the consumer engagement industry in general as well as my compliance work with dozens of companies, including specifically as regards TCPA compliance. I stay current with industry developments—both in terms of technology and compliance—and this has also informed my opinions.

### IV.    Statement of Opinions:

It is my opinion that the names and addresses of individuals, who received the text messages at issue in this case, cannot reliably be identified through objective or administratively feasible means, as there is no reliable method to determine historical authorized users or subscribers of all of the mobile telephone numbers that would be included within the putative class definition proposed in the Second Amended Complaint.  This is particularly problematic here where the text messages at issue were received by putative class members over *five years* ago and the relevant time period for the putative class stretches back to 2008—a period of over *eight years*.

**A. Problems Ascertaining Historic Mobile Subscriber Information.**

- **Name Directories**: As a preliminary matter, there is no available list of current or historical mobile telephone numbers (such as the White Pages or the 411 directory assistance databases for landlines). Some wireless carriers participate in a Caller Name ("CNAM") database. This facilitates the transmission of caller ID information similar to landline telephone services. The CNAM database is voluntary and subscribers must pay additional fees for this feature (which is usually bundled with other premium features). As a result, it is not universally available even among wireless carriers that offer the service. Another factor is carrier participation in the database—among the major carriers, AT&T, Sprint, T-Mobile, and Verizon are accounted for in this database, but Verizon Wireless has not been participating to date. Finally, CNAM is relevant only for current subscribers, and even then the data is not completely reliable due to latency in updates and inaccurate information provided by the wireless carriers. I am unaware of any source for CNAM data from a historical perspective going back to 2011 or earlier.

- **Commercial ID Services:** While PossibleNOW, LexisNexis, Neustar and others provide commercially available identification services, these do not provide reliably correct information. My research indicates that a significant percentage (approximately 25%) of the numbers in these databases provide no consumer name information. Additionally, in many instances the consumer information provided is either inaccurate or uses abbreviations and nicknames. The prevalence of family plans also renders these databases ineffective as a reliable means to identify historical users as the databases often do not account for common users of the phone number (*i.e.*, children, spouse, grandparents, etc.).

- **Mobile Telephone Number Reassignment**: In my experience, the name and address associated with a wireless telephone number today may not be the same person that owned the telephone number at a specified date in the past. Tens of millions of numbers are recycled each year. The high number of mobile telephone reassignments makes it difficult to reliably identify historical users of mobile telephone numbers. I am not aware of any solution or database that addresses the challenges brought on by reassigned mobile numbers. In other words, there is no database in existence today

that can reliably identify a prior user of a cell phone at a specific point in time in 2011, as would be the relevant time frame in this action. The current publicly available databases are unreliable for a number of reasons, including because customer records are often linked to the wrong mobile number and because these databases can only account for subscriber information rather than common user information.

The FTC and FCC administration of the National Do Not Call (DNC) Registry provides an example of the inability to reliably identify reassigned wireless numbers used at a specific point in the past. The Do Not Call Improvement Act of 2007 became effective in February of 2008. Previously, telephone numbers on the DNC registry expired after five years. The Act changed this, so that numbers placed on the registry remain permanently. When this change was made, the FTC and FCC implemented a "hygiene" process whereby telephone numbers contained within the DNC registry that were disconnected from the original subscriber and reassigned to a different subscriber name as well as a different address are removed. My parent company, PossibleNOW, Inc. is the subcontractor selected to perform this hygiene process. However, the hygiene process ONLY removes land line (residential) telephone numbers, as there is no reliably available data source to track disconnects and reassignments of mobile telephone users. The FTC acknowledged this fact in its 2008 Report to Congress. In relevant part, the FTC wrote, "Wireless carriers are not required to provide information to the National Directory Assistance (NDA) related to their disconnected or reconnected telephone numbers. FTC staff will continue to work with the subcontractor on ways of addressing the accuracy of cell phone registrations."[1] This fact further evidences the difficulty involved in accurately identifying users of mobile telephones.

Another complication concerning the identification of cellphone subscribers is that many major mobile telephone carriers offer their subscribers the option to change their wireless number without changing the carrier, in some cases as often as every 24 hours.

---

[1] Discussion of the process to maintain the accuracy of the DNC Registry. Page 6, Do Not Call Improvement Act Report to Congress October 2008.

EXPERT REPORT OF KEN SPONSLER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**1. Virgin Mobile**.
http://virginmobileusa.custhelp.com/app/answers/detail/a_id/5659/kw/change%20existing%20virgin%20mobile%20phone%20number
Ability: Once every 24 hours. No charge listed.

*Change your existing Virgin Mobile phone number*

You can change your current Virgin Mobile phone number in *My Account*. Simply log into My Account, go to the Add Phone, Apps & More section or the Settings & Preferences section, select Change Phone from the right-hand navigation and walk through the guided steps.

Important Info to Remember:

- Once you change your Virgin Mobile phone number, you cannot get your old phone number back.

- You're only allowed to change your phone number once every 24 hours using our website.

**2. Sprint**
https://support.sprint.com/support/article/Change-your-phone-number-on-sprintcom/case-ib376964-20090701-102238
Ability: Up to 3 times in 30 days. No charge listed.

# Change your phone number on sprint.com

**Last Updated:** Oct 13, 2015

There may be occasions where you need to change your phone number. You can change your phone number to a different number anywhere Sprint provides service. There is no fee for changing your number when using My Sprint.

**Tags :** Change, Change #, Change #, Change my #, Change my number, Change new number, Change number, Change number, Change number, Change ph #, Change phone, Change phone number, Change phone number, New number, Number, Number change, Phone # change, PTN Change

**Restrictions:**

1. You cannot choose a specific number. A new number will be randomly assigned.
2. You cannot change your phone number more than 3 times in 30 days.
3. Once your phone number is changed, you cannot switch back to your current number.
4. You will need to set up a new voicemail account and all your saved voicemail messages will be lost.
5. Changing your phone number will remove block or allow lists associated with that number. You will need to manually set up these lists for your new number.
6. You cannot port over a number from another carrier through this self-service process.

-10-
EXPERT REPORT OF KEN SPONSLER

### 3. **AT&T**

STEP-BY-STEP
## How to change your number

### Before you begin

**What to know before changing your wireless number**

- There's a $36 fee and the change takes effect immediately.
- Your monthly service charge will be prorated between your old and new numbers.
- Write down any important voicemail messages tied to your old number, as they won't transfer.
- You need to create a new greeting for your new number.

### Main steps

**If you want to keep your same area code**

You need to be logged in to your myAT&T account from your tablet or PC to complete these steps.

1. At the top of the page, select **myAT&T > Wireless > Change a Wireless Number.**
2. If you manage multiple accounts, select the **wireless account.**
3. In the **Account Information** section, select **Change a Wireless Number.**
4. If you have more than one phone on your account, select the **wireless number** you want to change.
5. Complete the requested information to change your number.

https://www.att.com/esupport/article.html#!/wireless/KM1011568

Ability: No frequency limitation listed. $36 fee for each change.

### 4. **Verizon**

http://www.verizonwireless.com/archive/mobile-living/network-and-plans/my-verizon-change-calling-plan-phone-number-features/

Ability: No frequency limitation listed. No charge.

#### Change your phone number

If you ever need to change your phone number — or just want to — **My Verizon** can get you fixed up and moved to new digits without a hassle.

You can get a new local number, get a number in a new location if you're moving, or even use an existing number from a different wireless carrier or landline.

EXPERT REPORT OF KEN SPONSLER

Video: http://www.verizonwireless.com/support/how-to-change-phone-number-video/

**5. T-Mobile**
Ability: No frequency limitation listed. $15 charge each time.
https://support.t-mobile.com/docs/DOC-2862

Learn how to change your phone number. There are a few reasons why you might want to change your wireless number, such as if you're receiving someone else's phone calls or if you recently moved.

Things to keep in mind:

- T-Mobile charges a $15 fee to change your phone number. If you're on a Pay in Advance plan, you're exempt from this fee.
- Changing your mobile number will delete all voicemail messages. You'll need to set up a new voicemail box for your new number. See phone how tos for voicemail access steps.
- Phone number changes can take up to 4 hours to complete.
- Caller ID systems for landline carriers can take up to 3 days to show the correct calling information.
- It may take up to 3 days to be able to access My T-Mobile using your new mobile number.

To change your phone number, contact T-Mobile Customer Service.

- **Subscriber-vs-User**: Even if there were reliable sources to determine the identity of subscribers from a historical perspective, this information does not definitively identify authorized users (who would be the recipients of the actual call or text), who may have provided prior express consent to call/text their mobile telephone numbers during the normal course of business. Wireless carriers may know the identity of the owner of the account (i.e., the subscriber) in which a telephone number is held, but often do not know the identity of the user of a telephone number in that account, if it is a multiline account. The reason for this is *none* of the main wireless carriers—AT&T, Verizon, T-Mobile, Sprint—require subscribers to provide the identities of each user

on their account.  In family plans, family members and/or friends share one wireless plan, and a single subscriber's name is associated with all the telephone numbers on the account.  For example, I have five telephone numbers associated with my AT&T account, which are assigned to the mobile telephones for myself, my spouse, my daughter, and my son-in-law, and to my iPad.  However, AT&T associates all of these telephone numbers with my name, and does not even know the name of my spouse, daughter and son-in-law.

A review of the Bates data AHI 0005672 to AHI 0005746, the US Cellular records obtained in this case, reveals that numerous accounts have more than one telephone numbers associated with it.  In fact, several accounts contained four or more telephone numbers including at least one account containing seven.  This fact illustrates that while US Cellular was able to associate multiple telephone numbers to a subscriber account the records do not identify authorized or regular users of the telephones.

Similarly, many employers provide mobile devices to their employees which could be used for personal as well as business purposes.  The business or government agency is the "subscriber" and is billed for the services, while the employees are authorized users.  Employees may be the called or texted parties and they have the ability to provide prior express consent to the calls.  Wireless carriers are unaware of the identity of individual employees who are authorized users.  These telephone numbers are also subject to frequent reassignment to new users as employees migrate in, out, and around these organizations.

- **Pre-paid Telephones**: Pre-paid telephone services introduce another difficulty in determining current as well as historical user information.  A prepaid wireless account is one in which the customer may have a short term relationship with the wireless services provider and is not billed for service.  Rather, the customer purchases usage credits in advance, and fees are deducted from the customer's account as it is used.

The spreadsheet (Bates AHI 0005285) shows that in November and December 2010, at least 326 (or 8.37 percent) recipient network numbers were assigned to a minimum of eight prepaid wireless telephone carriers.  The problem with accurately researching companies that offer, or offered at the time period in question, prepaid telephone services is that the carriers such as Boost or Tracfone are really just mobile

virtual network operators (MVNOs).  In other words, they run on a larger carrier's network and just brand it themselves.  For example, Boost Mobile runs on Sprint's network.  When performing a network level search for a Boost mobile number, it is going to show Sprint because that is the network actually being used.

269 (or 6.91 percent) recipient network numbers were assigned to unknown. Unknown means exactly that.  The recipient number could have been a landline that six years back was not set up for text-to-speech technology and bounced the incoming SMS into unknown cyber space.  Also, there is a lot of movement in the business arena of prepaid and wireless telephone carriers, which could account for these unknown networks.  For example, Cricket (Leap Wireless) was acquired by AT&T in 2014.  In 2014 Sprint was considering bringing back the remains of the Nextel brand it had turned off a year or two earlier, when it turned off the iDEN network.  In October 2010 Pocket Communications announced a merger with Cricket Communications.  In April 2012 U.S. Cellular and Alltel Wireless announced that they had joined together to begin offering U Prepaid, a no contract wireless service, in select Walmart Stores. Shenandoah Telecommunications Company ("Shentel") acquired nTELOS earlier this year.  Rural Cellular Corp. was purchased by Verizon Wireless in January 2009. Trying to go back six or more years to identify customers that most likely were never known to the prepaid telephone carriers in the first place, in my opinion, will not yield reliable, if any, results.

The spreadsheet Bates AHI 0005290 shows at least 1,762 (or 13.95 percent) recipient network numbers were assigned to a minimum of nine prepaid wireless telephone carriers.

A central problem in identifying subscribers and users of prepaid wireless numbers is that buyers of these services are generally not required to provide a name or any other identifying information to purchase the services.  Several states have enacted laws to require buyers of these telephones to provide their names but even that is problematic because there are no verification procedures to ensure true names are given. So at the end of the day, even if a certain pre-paid provider required information, because verification is often over the telephone, there is no way to ensure accurate subscriber information is provided.  And because no traditional bill is

EXPERT REPORT OF KEN SPONSLER

generated, there is no incentive to provide accurate subscriber information.  The often-used term "burner phone" encompasses this very issue.

It is also the case that pre-paid numbers ***do not*** always appear to be pre-paid.  For example, I have researched and studied telephone numbers that were unquestionably known to be assigned to pre-paid cellphone providers recently that were scrubbed by running them through NPA/NXX data out of curiosity, just to see the results.  The outcome described was that the results are highly unreliable, for example:

Tracfone often appears as Verizon or T-Mobile or Cingular

Boost Mobile often appears as Sprint or Nextel

Go Phone often appears as AT&T

Accordingly, the number of pre-paid numbers at issue may be much higher than what appears on the face of the relevant documentation (here, AHI 0005285 and AHI 0005290).  This is due to the aforementioned fact that most pre-paid phone service providers are actually providing services through other carrier networks.

- **Mobile Virtual Networks (MVO)**: Another layer of difficulty in determining historical user identities of mobile telephones is the increasingly common practice of "wholesaling."  Virgin Mobile, for example, actually provides all of its mobile subscriber services through Sprint.  Sprint wholesales bandwidth to Virgin Mobile.  Therefore, Virgin Mobile subscribers are actually on the Sprint network, though Sprint would not have any information, historical or otherwise, pertaining to these subscribers), which further complicates the ability to reliably associate subscribers.

- **Skip Tracing**: Skip Tracing methods are sometimes employed, usually by creditors or collectors in an attempt to locate persons or specific information about persons, such as an updated address or name.  Skip Tracers generally rely upon two basic techniques to find this information.  The first is the Internet, where publicly available information includes social media sites and search engines, and the second is fee-based data mining vendors, such as Accurint, ChoicePoint, Locate Plus, and a host of others.  In my experience, Internet-based mobile telephone identity services do not provide consistent, unequivocal, or reliable information regarding current or historical cellular telephone users.

EXPERT REPORT OF KEN SPONSLER

- **Reverse Look-up**: As a preliminary matter, it is my experience that reverse look-up databases are not a reliable and consistent means to determine historic subscriber information. To determine the historic subscriber for a particular number one can run a reverse look-up through various databases (*i.e.*, Intelius, Whitepages, Yellowpages, Spokeo, 411.com) that provide such services.

Although I have attempted this test several times in the past with different service providers, for the purposes of this report, I again attempted to identify the user of a mobile telephone number with which I am very familiar. For this test I used www.freephonetracer.com. Similar to others, this website claimed to be able to locate "owners" of mobile telephones, proclaiming in relevant part, "What Are Tracer Reports? *Tracer Reports are reverse phone lookups for cell phones and hard-to-find numbers. Results include phone owner's name, address, and people search results.*" I entered into the search query the mobile telephone number my spouse uses on our family plan. The return search indicated that there was an available match of information; however, in order to review this information, I could either join the service as a member for recurring monthly fees or I could pay a one-time fee of $9.95 to view this single record of information. I paid the $9.95 to view the information available for my spouse's mobile telephone, which is 770-843-XXXX. Below are the results:

| Category | True Information | Reported Information |
|---|---|---|
| Owner/User | My Spouse | Ken Sponsler |
| Mobile Provider | AT&T | Verizon |
| Address | Suwanee, GA | Alpharetta, GA |
| Email address | Bellsouth account | None |

My previous experience with these internet mobile user identity services has produced similar results. In this case, I paid $9.95 for a single query but did not receive one correct piece of information about the telephone number's user, carrier, or even the

city in which we actually live. In my opinion, this source of identifying members of the class is completely unreliable.

Such reverse lookup databases also list the telephone carrier for such numbers, which can then be cross-referenced with the North American Numbering Plan Administration (NANPA)—the organization that is responsible for assigning all phone numbers across North America. However, neither reverse look-up services nor NANPA provides any information about the identities of previous subscribers to the same number. In other words, while it may be possible to determine that Person A is the current subscriber to a particular number, these tools do not make it possible to determine either (a) how long Person A has been the subscriber, or (b) who the previous subscriber(s) to a particular number might have been or (c) the identity of authorized users who may have been the recipients of the call or text.

Reverse look-up databases will also often provide information that is contradictory to or inconsistent with other similar databases. For example, it is often the case that, for a given number, Database A will provide different information than Database B. This is why reverse look-ups produce significant false positives.

- **<u>Subpoena Telephone Carriers</u>:** My experience in multiple TCPA cases indicates that carrier responses to subpoenas are widely variable and thus will be an unreliable means to identify class members across different carriers. AT&T, for example, will not provide subscriber information without first advising subscribers and providing them an opportunity to object. Before it will release any information / call detail records ("CDRs"), it will contact every subscriber associated with the numbers that match the parameters of the subpoena to inform them of the subpoena and their rights. AT&T subscribers have up to fourteen days to reply. If AT&T receives the subscribers' consent, it will produce the record. If AT&T receives no reply, it will produce the record. Subscribers who object to the release of their CDRs must file a Motion to Quash with the respective courts. Depending on the location of the court (county, state, etc.) this can be a quick or a very drawn-out process. My recent experience with carrier responses to subpoena also reveals that some have refused to respond at all citing legal objections. Even when carriers do respond, their information often does not account for authorized users of telephones associated to an

EXPERT REPORT OF KEN SPONSLER

account.  This factor, as noted above, is prevalent in family shared plans as well as business or governmental issued telephones.  Carriers will only be aware of the primary account holder or subscriber but be completely unaware of family, friend or employee users associated with these accounts.  Carriers are also under no obligation to maintain historical account records when subscribers have ported their numbers to other carriers, which presents growing problems given the frequency with which consumers change providers.  Assuming it is even possible to issue a subpoena for each and every telephone carrier to identify subscribers to the relevant telephone numbers, this still leaves unanswered the question which telephone carrier serviced the telephone numbers during the class period.

If and when telephone companies do respond to subpoenas, they provide the information they are legally required to retrieve from archives at a price because they have to dedicate employees and resources to that job, therefore, they generally charge for this.  Depending on the number of records and how far back they are told to search their archives, the charges can be extremely, if not prohibitively, high.  For example, AT&T charges a one-time $35.00 processing fee to produce CDRs under subpoena.  On top of that, it charges $10.00 for each record for each month, i.e., if ten thousand (10,000) records had to be produced for a twelve-month time period, the cost would be $10 x 10,000 records x 12 months = $1,200,000.00 (one million two hundred thousand dollars) plus $35.00 processing fee.

- **Text Messages to Landlines**: The data at issue—namely, AHI 0005285 and AHI 0005290—indicates that many residential landlines were forwarded into the text program.  This is often denoted where the word "unknown" appears where the cell phone carrier would be identified.  My research and experience shows that whether residential landlines are capable of receiving text messages (also referred to as "Text to Speech") widely varies.  Depending on the carrier, there is a strong likelihood, especially in 2011/2012 (*see* Pre-Paid Telephones) when the messages at issue would have been transmitted, that text messages sent to these residential numbers would disappear into a void without being delivered and without any notification to the sender.

-18-
EXPERT REPORT OF KEN SPONSLER

**Summary of Opinions:** There are no objective and administratively feasible means to reliably identify subscribers and authorized users of mobile telephones from a historical perspective. While the documents I have been provided reflect the telephone number and telephone carrier of the putative class members during the relevant time period (dating back four years prior to the filing of the original complaint in this action, which was filed May 26, 2012, i.e., going back over eight years), there is no reliable way at this point to identify who were the subscribers and authorized users at the time. Accordingly, it is my opinion that the members of the putative class at issue in this case cannot be reliably identified through use of administratively feasible and objective procedures.

**V.   Reservation of Right to Amend**

I reserve the right to amend this report based on information received after issuance of the same. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 5th day of December, 2016, at Duluth, Georgia.

Ken Sponsler

**Exhibit A**

EXPERT REPORT OF KEN SPONSLER



# <u>Curriculum Vitae</u>

**Kenneth R. Sponsler, CECP, CIPP/US**
**CompliancePoint**
**4400 River Green Parkway, Suite 100**
**Duluth, GA 30096**
**(770) 255-1020**
**www.compliancepoint.com**
ksponsler@compliancepoint.com

**Current Employment:**

Senior Vice President and General Manager of CompliancePoint, Inc.'s Customer Engagement compliance practice located in Duluth, Georgia, a global professional services firm specializing in consulting and audit services.

**Education:**

120 hours of undergraduate study; 4.0 GPA (no degree conferred) University of Maryland; Troy University; City College of Chicago; Park University.

**Registrations, Licenses, Certifications:**

- Customer Engagement Certified Professional (CECP) by the Professional Association for Customer Engagement (PACE)
- Certified Information Privacy Professional (CIPP/US) by the International Association of Privacy Professionals (IAPP)
- Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO)

**Specialized Training:**

- U.S. Army Command Sergeant Major Course; First in Class
- Advanced Non-Commissioned Officers' Course; Distinguished Graduate

**Professional Experience:**

Sixteen years of general consultation practice concerning U.S. federal and state telemarketing operational compliance with a variety of national and global companies. Provides regulatory and operational compliance consulting services for telemarketing, email, mail, fax, SMS/text communications, and debt collection matters. Ken Sponsler has been designated as an "expert" in U.S. Federal District Court and provided expert opinions in numerous TCPA and TSR-related matters. CompliancePoint specializes in seller and telemarketer compliance, call center operations, compliance assessments, audits, and forensic call and call abandonment data analysis, with a focus on operational assessments, risk identification, gap analysis, and implementation of compliance policies, procedures and strategies. The

consulting practice includes seller/service provider relations, contracting, record keeping, training, monitoring, and enforcement. Additionally, Ken has provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. A retired U.S. Army Command Sergeant Major, he concluded his career as the Senior Enlisted Leader of the 3rd Infantry Division, leading a 23,400-man elite combat team.

**Publications and Webinars (including CompliancePoint products)**:

- *Text Message Compliance Webinar – September 2016*
- *2014 Compliance Review - 2015 Forecast, Regulatory Updates, Feb 2015*
- *2013 Compliance Review - 2014 Forecast, Regulatory Updates, Feb 2014*
- *Strategies For Compliance With New TCPA Requirements, March 2012*
- *Employment Placement Verification, February 2012*
- *2011 Compliance Legislation Review & 2012 Forecast, January 2012*
- *Proven Audit & Business Process Techniques For Compliance, June 2011*
- *Risk In Admissions & Financial Aid Practices, October 2010*
- *What Impacts Will The TCPA Changes Have On Your Business? Feb 2012*
- *Periodic Regulatory Information Charts*
- *Monthly Regulatory Information Charts*
- *Monthly Compliance Article for customer distribution (2007 – 2014)*

**Awards/Honors**:

- PACE 2016 Pioneer Award for the Difference Ken's Dedication and Support has made with PACE and the Industry, awarded by Professional Association of Customer Engagement
- PACE 2014 Chairman's Award for Distinguished Leadership and Service to the Industry
- Technovation Award 2010, awarded by American Teleservices Association
- Hewlett Packard Vendor of the Quarter Award (to CompliancePoint), 2007
- 18 separate personal awards by the U.S. Army, including the Legion of Merit

**Memberships**:

- *American Teleservices Association* (now PACE)
  - Member, National Board of Directors
  - Member, Self-Regulatory Organization Trustee
  - Federal Legislative Committee Member
  - State legislative Committee Member
  - "Do Not Call" Implementation Committee Member
  - Compliance Officer's Forum Member
- *Professional Association of Customer Engagement, Southeast Chapter*
  - Member, Board of Director

**Memberships (cont'd):**
- *International Association of Privacy Professionals*
  - Consumer Marketing Working Group
- *Direct Marketing Association*
  - Teleservices Committee Member

**Presentations and Colloquies:**

Frequent speaker at industry events, including PACE Annual Convention; Direct Marketing Association Teleservices Conference; College of Information Assurance Professional's Governance; Risk and Compliance Summit; Noble User's Conference; and Quarterly Compliance Focused Webinar Presentations.

# EXHIBIT B



KEN SPONSLER
ksponsler@compliancepoint.com

1.      I am Ken Sponsler, I am Senior Vice President and General Manager of CompliancePoint, Inc.'s Customer Engagement compliance practice. CompliancePoint is a global professional services firm specializing in consumer contact compliance consulting and audit services, located in Duluth, Georgia.

**Qualifications**

2.      I have over 16 years of operational experience in business to business and business to consumer global direct marketing compliance matters. I have personally conducted dozens of onsite compliance assessments, gap analyses, and risk assessment studies. I have assessed numerous call center operations on behalf of potential seller-clients as a due diligence measure prior to sellers entering into contractual relationships for services. I have provided expert reports in several TCPA-related matters, including issues specifically related to identifying authorized users of mobile telephones. CompliancePoint's parent company, PossibleNOW, Inc., is a provider of marketer compliance technologies, including mobile telephone identity services.

3.      My familiarity with direct-to-consumer marketing industry standards began in early 2000. After my transition from 27 years of military service, I worked as a project manager on the development of a software product called "The DNCSolution". This product enables sellers and telemarketers to comply with federal and state Do Not Call laws by allowing companies to check calling campaign lists against all federal and state Do Not Call lists, company-specific Do Not Call lists, as well as wireless lists. My work on this project led to my study of federal and state Do Not Call laws, as well as exemption criteria. As the "DNCSolution" product evolved to comply with more restrictive state laws, I realized the need for a consultative service, and I started a compliance consulting practice in 2005 to help clients understand how these laws applied to them.

4.      My compliance consulting practice revolves around assisting sellers, service providers, and other related third parties to understand telemarketing standards and regulations and to implement operational procedures to ensure compliance with such standards and regulations. I have developed practices, systems, and training to ensure such compliance. These include compliance officer **training programs**, call data compliance **audits,** call center compliance **assessments**, as well as seller-service bureau **risk mitigation consulting.**

5.      My consulting practice monitors ever-changing federal and state regulatory requirements, as well as civil actions and published materials from industry experts. My years of experience in these matters involve a host of industry verticals such as financial services, insurance, retail, home alarm services, satellite and cable services, tele-services, vacation and cruise lines, lead generation, and the career college industries.

6.      I have assisted many clients to implement compliance standards in various due diligence areas including the development of:

    i.    Corporate compliance governance procedures

    ii.    Compliance review committee charters

    iii.    Third party provider contractual obligations to comply

    iv.    Compliance policy and procedure manuals

    v.    Compliance training and testing materials

    vi.    Compliance monitoring and enforcement procedures

    vii.    Escalation policy and procedure

    viii.    Critical task risk assessment analysis

    ix.    Agent quality assurance and compliance monitoring methodologies

7.      I have provided training and instructions relative to direct marketing compliance in the following circumstances:

    i.    Direct to consumer marketing compliance officer training courses for compliance staff and corporate legal departments

    ii.    Call center agent training regarding corporate Do Not Call policies

    iii.    Quality Assurance staff training to incorporate compliance monitoring and scoring

    iv.    College campus admissions representative training regarding telemarketing and corporate compliance

    v.    Customer compliance awareness training for dialer technology providers

    vi.    Compliance training modules for SMS/text service provider customers

    vii.    Trade association compliance seminar presentations

8.      Additionally, I have been retained to monitor compliance with court orders or settlements in the following instances:

    i.     Compliance assessments of potential third-party providers

    ii.     Monthly call data and call abandonment audit analysis and reporting

    iii.    Ongoing announced and unannounced call center audits

    iv.    Consumer call attempts monitoring to prevent over-dialing

    v.     Call time restriction compliance monitoring

    vi.    Admissions agent truthful disclosure monitoring

9.     I provide compliance retainer services for over five dozen firms, including several fortune 500 companies. I provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. I have undergone specialized training at U.S. Army Command Sergeant Major Course (Graduated with Honors) and the Advanced Non-Commissioned Officers' Course (Distinguished Graduate). I retired from the U.S. Military after achieving the highest enlisted rank of U.S. Army, Command Sergeant Major, of the 3rd Infantry Division, a 23,400 man elite combat team.

10.    I have been retained as an expert or consultant on various issues relating to call center operations. This work includes technical analysis of dialer technology to determine if the dialer meets the FTC/FCC definition of an Automatic Telephone Dialing System. I have personally assessed dozens of call center operations and monitored hundreds of agent calls to assess agent-compliant behaviors. I have developed call center-specific audit parameters that are in use today, in order to assess third-party call center compliance under contract with large scale seller companies. These audits incorporate federal, state, and individual seller policies and procedure compliance measures.

11.    From 2007 to 2014 I published a monthly article included in the PossibleNOW newsletter on compliance-related topics entitled "Commentary by Ken Sponsler". This newsletter has a circulation of approximately 2,000 and is widely accepted in the industry as a resource for compliance-related updates and operational analysis. Following are a few of the pertinent webinars I conducted: *Text Message Compliance Webinar,* September 2016; *Strategies For Compliance With New TCPA Requirements*, March 2012; *Employment Placement Verification*, February 2012; *2014 Compliance Legislation Review & 2015 Forecast,* February 2015; *Proven Audit & Business Process Techniques For Compliance,* June 2011; *Risk In*

*Admissions & Financial Aid Practices*, October 2010; periodic regulatory information charts; and monthly regulatory information charts.

12.     I organize quarterly compliance-related webinar presentations to PossibleNOW and CompliancePoint customers regarding operational compliance subject matter such as:

   a.   Compliance with the TCPA final rules regarding calls/texts to wireless numbers

   b.   Federal and state enforcement and settlement action lessons learned

   c.   Changes to federal and state consumer contact laws

   d.   Global compliance and privacy updates

   e.   Expressed Consent standards under the federal E-Sign Act

   f.   Trends in the mobile marketplace

   g.   Do Not Call and Call Abandonment safe harbor compliance

   h.   Seller-Service Bureau mutual due diligence requirements

   i.   Telemarketer registration and bonding requirements

   j.   Do Not Call compliance data auditing lessons learned

   k.   Record keeping lessons learned from the Civil Investigative Demand

   l.   Federal and state established business relationship exemption criteria

   m.   Call time restriction compliance

   n.   Federal and state disclosure requirements

   o.   Lead generator due diligence issues

   p.   How to prepare and respond to federal and state investigative demands

13.     I am a member of the National Board of Directors for the Professional Association of Customer Engagement (PACE, formerly the American Teleservices Association). I have been personally involved in the development and operation of a Self-Regulatory Organization (SRO) for the direct to consumer marketing industry. The SRO establishes industry best practices standards for compliance, as well as consumer advocacy. I was personally involved in the development of these standards, as well as the audit methodologies and currently serve as a national SRO trustee. I have expertise in the application of those standards to the individual conduct of telemarketers. Companies hire consultants, such as me, to ensure that their

employees or third parties, who engage in telemarketing on their behalf, comply with these standards.

14.     I have been asked to provide presentations and colloquies and am a frequent speaker at industry events, including but not limited to: PACE Annual Convention and Washington Summit, Direct Marketing Association Teleservices Conference, College of Information Assurance Professional's Governance, Risk and Compliance Summit, Noble User's Conference, The Association of Private Sector Colleges and Universities Annual Conference (APSCU), The Customer Engagement Management (CEM) Conference, Dish Network's Annual Retailer Conference, Campus Management Corporation (CMC) Annual Conference, Life Office Management Association (LOMA), Quarterly Compliance Focused Webinar Presentations, LeadsCon annual conference, and the Allied Solutions financial services member conference.

15.     I hold the following registrations, licenses, and certifications: Customer Engagement Certified Professional (CECP) by the Professional Association for Customer Engagement (PACE), Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO), and Certified Information Privacy Professional/United States (CIPP/US) by the International Association of Privacy Professionals (iapp).

16.     I have received the following professional recognition for my work in this field: Awards/Honors: 2016 PACE Pioneer Award, 2014 PACE Chairman's Award for Distinguished Leadership and Service to the Industry, Technovation Award awarded by American Teleservices Association (ATA), 2010. The ATA (now Professional Association of Customer Engagement "PACE"), is a national trade organization for the contact center industry. Each year, the organization awards the "Technovation Award" for the most significant product or service that benefits the goals of the association and the contact center industry. My consulting practice received this award for our development of the call data compliance audit program. This program involves monthly call data compliance audits of call centers. Call centers participating in the audits showed significantly reduced non-compliant outbound calls. This is accomplished by immediately identifying anomalies and the causes of the error, as well as the implementation of remediation procedures to prevent future errors; Hewlett Packard Vendor of the Quarter Award (to CompliancePoint), 2007. Hewlett Packard awarded this distinction to

CompliancePoint as a result of the quality and value of our compliance assessment and retainer services. 18 separate personal awards by the U.S. Army, including the Legion of Merit.

**Summary of Expert Experience**

In the past five years, I provided trial testimony in Federal District Court relative to *United States of America, et al., v. DISH Network L.L.C.,* No. 3:09-cv-03073 (C.D. Ill.) and ADT Security Services Inc., v. Security One International, No. 11-cv-05149 (N.D. Cal.).

I was retained to provide testimony as an expert in the following matters: *Jamison v. First Credit Services, Inc.,* No. 1:12-cv-04415 (N.D. Ill.); *Warnick v. DISH Network,* No. 1:12-cv-01952 (D. Colo.); Manno *v. Healthcare Revenue Recovery Group*, No. 11-cv-61357 (S.D. Fla.); *United States of America, et al., v. DISH Network,* No. 3:09-cv-03073 (C.D. Ill.); *Navarro v. Sears Life Insurance Company*, No. 2:08-cv-00527 (E.D. Cal.); *Trilegiant Corp. v. Sitel Corp.*, No. 1:2009-cv-06492 (S.D. NY); *ADT Security Services, v. Security One International,* No. 11-cv-05149 (N.D. Cal.); *Wojcik v. Buffalo Bills,* No. 8:12-cv-2414 (M.D. Fla.); *Keating v. Peterson's Nelnet,* No. 1:11-cv-01775 (N.D. Ohio); *Lee v. Stonebridge Life Insurance Company,* No. 11-cv-0043 (N.D. Cal.); *Lopera v. The Receivable Management Services Corp.,* No. 1:12-cv-09649 (N.D. Ill.); *Rodriguez v. Allied Interstate,* No. 3:13-cv-00388 (S.D. Cal.); *Horton v. Cavalry Portfolio Services,* No. 3:13-cv-00307 (S.D. Cal.); *Benzion v. Vivint,* No. 0:12-cv-61826 (S.D. Fla.); *D'Agostino v. Jesta Digital,* No. 2:12-cv-09712 (C.D. Cal.); *Physicians Health-source, Inc. v. Stryker Sales Corporation,* No. 1:12-cv-00729 (W.D. Mich.); *Ranwick v. Texas Gila*, No. 13-cv-02792 (D. Minn.); *Shamaan v. Monex Credit Company, et al.,* JAMS Arbitration No. 1200041941; *Bug Pro v. Universal Adcom,* No. 4:13-cv-646 (E.D. Ark.); *Flanigan v. The Warranty Group,* No. 14-cv-1261 (N.D. Ill.); *Molnar v. NCO Financial Systems*, Nos. 3:13-cv-00131 and 3-13-cv-00685 (S.D. Cal.); *Glassbrook v. Rose Acceptance,* No. 13-cv-10152 (E.D. Mich.); *Federal Trade Commission and several state Attorneys General v. One Technologies*; *Bates v. Dollar Loan Center,* No. 2:13-cv-01731 (D. Nev.); *Tsai v. 24 Hour Fitness USA*, No. 2:14-cv-04503 (C.D. Cal.); *Prater v. Medicredit,* No. 4:14-cv-00159 (E.D. Mo.); *Selby v. LVNV Funding*, No. 13-cv-1383 (S.D. Cal.); *In Re: Convergent Telephone Consumer Protection Act Litigation,* MDL, No. 3:13-md-02478 (D. Conn.); *Hooker v. Sirius XM Radio,* No. 4:13-cv-00003 (E.D. Va.); *Rinky Dink v. Electronic Merchant Systems*, No. 2:13-cv-01347 (W.D. Wash.); *Bianchi v. Dynamic Recovery Solutions,* No. 0:13-cv-61997 (S.D. Fla.); *Legg v. Quicken Loans,* No. 0:14-cv-61116 (S.D. Fla.); *In Re: Midland Credit Management, Telephone Consumer*

*Protection Act Litigation,* MDL, No. 11-md-2286 (S.D. Cal.); on behalf of UTC Fire & Security Americas Corporation, Inc., *In Re: Monitronics International, Telephone Consumer Protection Act Litigation,* MDL, No. 1-13-md-2493 (N.D. W.Va.); *True Health Chiropractic. v. McKesson Corp.,* No. 3:13-cv-002219 (N.D. Cal.); *Daisy, Inc. v. Pollo Operations, Inc.,* No. 2:14-cv-00564 (M.D. Fla.); *Byrd v. Equinox Holdings,* No. 2:14-cv-08226 (C.D. Cal.); *Physicians Healthsource v. Greenway Health,* No. 8:14-cv-02593 (M.D. Fla); *Bridge v. Credit One Bank,* No. 2:14-cv-01512 (D. Nev.); *Camarena v. Vanderbilt Mortgage and Finance,* No. 3:15-cv-00305 (E.D. Tenn.); *Phillips v. Coca-Cola, et al.,* No. 2:12-cv-04033 (N.D. Ala.); *Melito v. American Eagle Outfitters,* No. 1:14-cv-02440 (S.D. N.Y.); *Tomeo v. Citigroup,* No. 13-cv-04046 (N.D. Ill.); *Heidarpour v. Central Payment Co.,* No. 4:15-cv-00139 (M.D. Ga.); *Rivera v. Exeter Finance Corp.,* No. 1:15-cv-01057 (D. Colo.); *Autovest, L.L.C., assignee of Wells Fargo Financial, Inc. v. D. Muncy and M. Muncy,* No. 14-C-303 (Circuit Court of Logan County. W.Va.); *Johansen v. Liberty Mutual Insurance Company,* No. 1:15-cv-1290 (D. Mass.); *Newhart v. Quicken Loans,* No. 9:15-cv-81250 (S.D. Fla.); *Mey v. Frontier Communications,* No. 3:13-cv-01191 (D. Conn.); *Raffin v. Medicredit Inc. and The Outsource Group, Inc.,* No. 2:15-cv-04912 (C.D. Cal.); *JWD Automotive, Inc. v. DJM Advisory Group,* No. 2:15-cv-00793 (M.D. Fla.); *Russell M. Holstein, Ph.D. LLC v. Banner Life Insurance Company,* No. 3:16-cv-00462 (D. N.J.); *O.P. Schuman & Sons, Inc. v. DJM Advisory Group, LLC,* No. 2:16-cv-03563 (E.D. Pa.); *Ginwright v. Exeter Finance Corp.,* No. 8:16-cv-00565 (D. Md.); *Jacobs v. Quicken Loans,* No. 9:15-cv-81386 (S.D. Fla.); *Buja v. Novation Capital,* No. 9:15-cv-81002 (S.D. Fla.); *Abante Rooter and Plumbing v. Birch Communications, Inc.,* No. 1:15-cv-03562 (N.D. Ga.); *Pinchem v. Regal Medical Group, Inc.,* No. 2:15-cv-06518 (C.D. Cal.); *Keim v. ADF Companies and Pizza Hut, Inc.,* No. 9:12-cv-80577 (S.D. Fla.); and on behalf of Alliance Security, Inc. *In Re: Monitronics International, Telephone Consumer Protection Act Litigation.,* MDL, No. 1-13-md-2493 (N.D. W.Va.).

# EXHIBIT C



## Summary of Expertise

In the last four years, I have been qualified as an expert in U.S. Federal District Court, and have been retained to provide deposition testimony as an expert, in the following matters:

*Manno v. Healthcare Revenue Recovery Group,* No. 11-cv-61357 (S.D. Fla.); *United States of America v. DISH Network*, No. 3:09-cv-03070 (C.D. Ill.); *Trilegiant Corp. v. Sitel Corp.*, No. 1:2009-cv-06492 (S.D. N.Y.); *ADT Security Svcs. v. Security One International*, No. 11-cv-05149 (N.D. Cal.); *Horton v. Cavalry Portfolio Svcs.,* No. 3:13-cv-00307-JAH-WVG (S.D. Cal.); *Shamann v. Monex Credit Co., Arbitration Proceeding JAMS Reg. 1200041941; Molnar v. NCO Financial Systems, Inc.*, Nos. 3:13-cv-00131 and 3-13-cv-00685 (S.D. Cal.); *Hooker v. Sirius XM*, No. 13-cv-0003 (E.D. Va.); *True Health Chiropractic, Inc. v. McKesson Corp.,* No. 13-cv-02219 (N.D. Cal.); *Bridge v. Credit One Bank*, No. 2:14-cv-01512 (D. Nev.); and *Raffin v. Medicredit, Inc*., No. 2:15-cv-04912 (C.D. Cal.).

I also provided trial testimony in federal court in the matter *United States of America v. DISH Network*, No. 3:09-cv-03070 (C.D. Ill.).

December 2016