# EXHIBIT R

PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# SECOND EXPERT REPORT OF ROBERT BIGGERSTAFF

Prepared in the matter of:
*Brian Keim v. ADF Midatlantic, LLC, et al.*

Case No. 9:12-cv-80577-KAM

Pending in the United States District Court for the Southern District of Florida
West Palm Beach Division

January 5, 2017

**Notice**
This document is proprietary and confidential.  If you are not the intended recipient of this document, any use, dissemination, distribution, or duplication of this document or any portion of its contents is expressly prohibited. The information contained in this document may also be privileged and/or subject to nondisclosure under applicable court rules.

Copyright© 2016 Robert Biggerstaff.  All Rights Reserved.  No portion of this document or any exhibits, appendices, attachments, or any other parts hereof, in whole or in part, may be duplicated or used for any purposes by anyone other than the client for whom this document was prepared, without the express written permission of the author.

PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Disclaimer**

This document many contain or describe software, algorithms, methodologies, processes, texts, businesses methods, patents, or other items that are the property of other entities and used under license or other permitted use.  Any implementation, distribution, storage, copying, or other use of such property may be subject to restrictions.

Any registered marks used within this document are the property of their respective owners.  They are used herein only for the purposes of identification and do not indicate any endorsement or approval by those owners.

Linux® is a trademark of Linus Torvalds.
Windows® is a trademark of Microsoft Corporation.
Visual FoxPro® is a trademark of Microsoft Corporation.
HylaFAX® is a trademark of Silicon Graphics, Inc.
Slackware® is a trademark of Patrick Volkerding.
ReiserFS® is a trademark of Hans Reiser and the Naming System.
FaxFacts® is a registered trademark of Copia International, Ltd.
GNU® is a trademark of the Free Software Foundation.
CAAS® and ISETTLE® are trademarks of A.B. Data, LTD.
MySQL® is a trademark of Oracle Corporation.
MariaDB® is a trademark of Monty Program Ab.
FTK® is a trademark of Access Data, Inc.
Zetafax® is a trademark of Equisys.
RightFax® is a trademark of OpenText Corp.
Openfax® is a trademark of idigital Technologies, Inc.
PROFAX® is a registered trademark of CyberData, Inc and/or Profax, Inc.
WestFax® is a trademark of WestFax Inc.
WinHex® and X-Ways Forensics® are trademarks of X-Ways Software Technology AG.
ActFax® is a registered trademark of ActFax Communication
Encase® and EnScript® are trademarks of Guidance Software, Inc.
DB2® and RACF® are trademarks of IBM Corp.
WinFax® is a trademark of Symantec Corp.
eFax® is a registered trademark of j2 Global.
Reference Legal®, SalesGenie® and InfoUSA® are trademarks of Infogroup, Inc.
ACT!® is a trademark of Sage Software, Inc.
Goldmine® is a trademark of FrontRange Solutions USA Inc.

**PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

**Executive Summary**......................................................................... 4

**Retention and Scope of Work.** ........................................................... 4

**Background and Qualifications..** ....................................................... 4

**Materials Reviewed**......................................................................... 4

**Analysis and Findings**...................................................................... 5
    Introduction............................................................................... 5
    Carrier Subscriber Data............................................................... 6
    Carrier Subpoena Responses........................................................ 7
    Distribution of Class Members Among Carriers............................... 7
    Resellers..................................................................................... 8
    Analysis Related to Reassigned Numbers...................................... 9
    Family Plans.............................................................................. 10

**Conclusions**.................................................................................. 11

**Table of Exhibits**........................................................................... 13

**PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

## Executive Summary

1. This report supplements my prior report dated November 10, 2016, wherein I found records consistent with a text broadcasting campaign involving a total of 63,837 unique phone numbers. I found 16,510 unique phone numbers were submitted as "referrals" and I found 13,046 of those phone numbers were sent 146,030 substantive text messages after that referral.

2. In this report, I address claims by Mr. Sponsler that identifying the subscribers and status as a "family plan" for those phone numbers in the relevant time frame cannot reliably be done through objective or administratively feasible means.

## Retention and Scope of Work

3. On November 10, 2016, I submitted the Expert Report of Robert Biggerstaff ("prior report") in this matter. Subsequently I received additional materials that are the subject of this report.

4. Some materials I have examined and reported on in this case may be subject to a *Stipulation Regarding Confidential Information* dated February 4, 2016.

## Background and Qualifications

5. My background and qualifications are the same as set out in my first report.

## Materials Reviewed

6. In addition to any materials cited elsewhere herein and in my prior report, I reviewed the following material in the process of producing this report:

   a. Transcript of the deposition of Kenneth Sponsler, dated June 24, 2015 in the matter of *True Health Chiropractic, Inc., v. McKesson Corp.*, No. 13-CV-02219 (N.D. Cal)("Sponsler Depo.")

   b. Defendants' Rebuttal Expert Report of Ken Sponsler, dated Dec. 5, 2016 ("Sponsler Rept.")

   c. Subpoenas and Responses:

      - Subpoena and Rider to Sprint-Nextel dated May 17, 2016 and response.
      - Subpoena and Rider to Verizon dated May 17, 2016 and response.

**PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

- Subpoena and Rider to U.S. Cellular dated May 17, 2016 and response (undated).

7. I have also relied generally on orders, notices, and other promulgations of the Federal Communications Commission ("the Commission") regarding the agency's administration of the TCPA.

8. In preparing this report, I have also relied on knowledge and skills I acquired through my education, training, career, and experience.

## Analysis and Findings

### *Introduction*

9. In my work for over 30 years assisting clients and employers in solving challenges regarding computers and data analysis, the solution is often to break a large problem down into smaller ones that are each solvable. In the same way that a large bundle of sticks can be easily broken in half by splitting the large bundle into smaller groups, technology solutions come easily when a large problem can be broken down into multiple smaller issues. I have found the same is true with identifying historical subscribers to phone numbers for purposes of the TCPA.

10. For example, simple statistical analysis based on the rate of reassignment of phone numbers shows that around 70% of the phone numbers at issue in this case have not had a subscriber change in the intervening 5-8 years.[1] Therefore, historical data is expected to be needed for less than 30 % of the phone numbers. So even if historical data for reassigned numbers was not available for one-fourth of the remaining phone numbers, that is only 7.5% of the total phone numbers at issue.

11. In supporting his opinion, Mr. Sponsler references many data sources and types of data that are simply irrelevant. He has also artificially limited his analysis inappropriately. For example, he references "Name Directories", CNAM databases,

---

1. *See* paragraph 30, *infra*.

PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Commercial ID services[2], skip tracing,[3] and reverse lookup databases.[4]  These are inapposite because the first source to check is the source of that data: the carriers.

### *Carrier Subscriber Data*

12. Mr. Sponsler claims that "[t]here are no objective and administratively feasible means to reliably identify subscribers and authorized users of mobile telephones from a historical perspective."[5]  This statement is inaccurate.

13. Mr. Sponsler has previously made similar broad categorical claims that a means of identifying historical subscribers is unavailable.  For example he said in another report "there is no available data source to identify the historical subscribers associated with facsimile numbers."[6]  Ironically, in the same deposition he admits that "some carriers may retain historical records of former subscribers for several months or years."[7]  Indeed, he conceded that some carriers do maintain that information and he has received it from carriers in another case.[8]

14. In my experience, all carriers maintain historical subscriber information for at least some period of time.  In my experience, carriers such as AT&T that command large portions of market share, do retain historical subscriber information, while carriers that lack that data are more commonly smaller land-line (not cellular) carriers with little market share.

15. Of all their data, I have found carriers maintain subscriber identification records the longest (typically many years after a subscriber has no longer been a customer) particularly since those records are not voluminous like call detail records, and have continued business uses.  In addition, when asking for data for a list of phone numbers, larger carriers such as AT&T have dedicated teams with automated systems

---

2. Sponsler Rept., p.8.

3. Sponsler Rept., p.15.

4. Sponsler Rept., p.15.

5. Sponsler Rept., p.19.

6. Sponsler Depo., p. 38.

7. *Id.*, p.41.

8. *Id.*, p. 38.

**PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

that can produce the desired information automatically, efficiently, and at low cost. Experienced law firms and class administrators are adept at securing and processing this data in class actions.

16. Unlike voluminous call detail records, subscriber data takes up very little space and has particular business value for many years. First, it is obviously kept for decades as long as the customer is an active customer. Second, it is useful to the carrier for identifying returning customers in the future, both to welcome desired applicants, as well as to identify undesirable customers such as those who violated terms of use in the past or had bill payment issues.

### *Carrier Subpoena Responses*

17. When asking for data for a list of phone numbers, larger carriers such as AT&T have dedicated teams with automated systems that will produce the desired information automatically and efficiently. In my experience, smaller carriers are much more likely to be the ones to complain of a burden in complying with civil subpoenas, particularly from out-of-state courts that a small carrier who only operates in a small geographic region may feel lack jurisdiction over the carrier. In my experience, smaller land-line carriers are also the ones more likely to have less historical data than larger carriers. Based on my experience I anticipate no difficulties in logistics or cost in obtaining the subscriber data from any of the carriers at issue in this case.

### *Distribution of Class Members Among Carriers*

18. For the 13,046 phone numbers I identified in my first report that received subject messages after a referral, I found the distribution of the carriers as follows:

|    | Phones | Carrier | Share | Cumulative Share |
|----|--------|---------|-------|------------------|
| 1  | 4,133  | Verizon Wireless | 31.68% | 31.68% |
| 2  | 3,307  | Cingular Wireless (AT&T) | 25.35% | 57.03% |
| 3  | 1,984  | Sprint PCS Wireless | 15.21% | 72.24% |
| 4  | 1,465  | T-Mobile | 11.23% | 83.47% |
| 5  | 559    | US Cellular | 4.28% | 87.75% |
| 6  | 380    | Cricket (Leap Wireless) | 2.91% | 90.66% |
| 7  | 322    | Boost Mobile CDMA | 2.47% | 93.13% |
| 8  | 275    | Metro PCS | 2.11% | 95.24% |
| 9  | 230    | Unknown | 1.76% | 97.00% |
| 10 | 188    | Boost Mobile iDEN | 1.44% | 98.44% |
| 11 | 122    | Nextel Communications | 0.94% | 99.38% |
| 12 | 54     | NTELOS (Sprint) | 0.41% | 99.79% |

**PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

| | | | | |
|---|---|---|---|---|
| 13 | 8 | Alltel | 0.06% | 99.85% |
| 14 | 5 | Appalachian | 0.04% | 99.89% |
| 15 | 5 | Arch Paging | 0.04% | 99.93% |
| 16 | 4 | other-wireless | 0.03% | 99.96% |
| 17 | 1 | Cellular South | 0.01% | 99.97% |
| 18 | 1 | Immix Wireless | 0.01% | 99.98% |
| 19 | 1 | Pocket Wireless | 0.01% | 99.98% |
| 20 | 1 | Rogers AT&T (GSM) | 0.01% | 99.99% |
| 21 | 1 | Rural Cellular Corp. | 0.01% | 100.00% |
| | **13,046** | | | |

19. This distribution indicates that by querying only 8 carriers, over 95% of the subscribers can be identified.

### *Resellers*

20. Mr. Sponsler suggests that carriers which resell another carrier's service (Mobile Virtual Network Operators or "MVNOs") present an obstacle to identifying the subscriber and provides an example of Virgin Mobile:[9]

    > Virgin Mobile, for example, actually provides all of its mobile subscriber services through Sprint. Sprint wholesales bandwidth to Virgin Mobile. Therefore, Virgin Mobile subscribers are actually on the Sprint network, though Sprint would not have any information, historical or otherwise, pertaining to these subscribers), which further complicates the ability to reliably associate subscribers.

21. First, this is directly contrary to my experience. In other cases I have worked on, there has been no problem with MVNOs and retrieving subscriber information for numbers that have been used by MVNOs. Indeed, I have worked on TCPA cases involving calls to land line numbers (where, unlike cell phone numbers, there are many more small resellers and competitive local exchange carriers ("CLECs") where subpoenas to over 100 carriers were involved. This presents no difficulty as I can aggregate data from 100 carriers just as easily as from 3 carriers.

22. Second, this notion is directly rebutted by the subpoena responses from Sprint and Verizon in this case, which were able to provide data for each cell number submitted.

---

9. It is unclear why he chose an example of Virgin Mobile, since it is not represented to be the carrier of any of the calls in this case, and Sprint has already replied with data for all of the numbers associated with Sprint.

**SECOND EXPERT REPORT OF ROBERT BIGGERSTAFF**                                    JANUARY 5, 2017
Keim v. ADF Midatlantic                                                            PAGE 8 OF 13

**PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

23. Finally, even if the facilities-based carrier (MNO as opposed to a MVNO) like Verizon did not have access to the subscriber data for some small portion of numbers being used by an MVNO like Virgin, the MVNO certainly does have that subscriber data.

### *Burner phones and customer-initiated change of phone numbers*

24. The notion that existence of "burner" phones prevent identification of any significant numbers of subscribers is merely hypothetical. I am not aware of any data that indicates the number of "burner phones" is anything other than a tiny fraction of active cell phones.

25. The fact that cell phone subscribers can change their cell phone numbers is similarly not identified with any quantitative criteria. It is also counterintuitive since it is self evident that people want to keep their phone numbers, as evidenced by the millions of ported numbers each year. Ultimately, it has no bearing here, as for any number of phone numbers changed by the subscriber, the carriers retain the subscriber data as described earlier, and the data in this matter includes the date and time of each message.

### *Analysis Related to Reassigned Numbers.*

26. Mr. Sponsler raised the notion that reassigned numbers "make[] it difficult to reliably identify historical users of mobile telephone numbers."[10] However he fails to identify the *rate* of number reassignment or relate it *quantitatively* to the data in this case. Simply statistics shows that what the issue of reassigned numbers is quantitatively small in this case.

27. Mr. Sponsler also opined that:

> I am not aware of any solution or database that addresses the challenges brought on by reassigned mobile numbers. The current publicly available databases are unreliable for a number of reasons, including because customer records are often linked to the wrong mobile number and because these databases can only account for subscriber information rather than common user information.

28. First, he has inappropriately limited his search for solutions to "publically available" databases. The subscriber data maintained by carriers is not "publically available" yet it is easy available via subpoena (as demonstrated by the subpoena responses already received by Defendants). In addition, companies such as Experian and Lexis offer

---

10. Sponsler Rept., p.8.

**PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

identification services, that, while not publicly available, are more reliable that the publically available sources Mr. Sponsler identified. Also, Neustar now has historical subscriber information that contains the date of porting and reassignment. Second, in my experience, historical data on subscribers is widely available from the carriers.[11]

29. Mr. Sponsler conceded that carriers do maintain the *current* subscriber information and the date service started.[12] In practice, the current subscriber is the same as the person who used the number 5 to 8 years ago for the vast majority of the phone numbers at issue based on simple math.

30. According to FCC documents, there are approximately 700 million phone numbers in use in the US.[13] Reassignment rates (i.e the churn rate or rate that numbers are disconnected and reconnected to a new subscriber) have been reported by the FCC at 37 million numbers annually.[14] This is a churn rate of 5.3% annually.[15] At this average reassignment rate, in the 5 to 8 years since the calls at issue in this case were sent, 76% of those phone numbers would be expected to still belong to the same subscribers as 5 years ago and 65% for calls made 8 years ago. So for an average of 70.4% of the numbers, the *current* subscriber info, would be the *same* as the subscriber information 5 to 8 years ago. Therefore the carrier data for the current subscriber (which Mr. Sponsler concedes is available) would be expected to identify the subscribers at the time of the calls in this case for approximately 70% of the 13,046 unique cell numbers that were sent text messages 5 to 8 years ago.[16] By examining the date service started for each phone number (which Mr. Sponsler

---

11. Indeed, in deposition Mr. Sponsler conceded that some carriers do maintain that information and he has received it from carriers in another case.

12. Sponsler Depo., pp. 38-39.

13. 677 million in 2011. FCC Wireline Competition Bureau, *Numbering Resource Utilization in the United States*, (2013).

14. Alyssa Abkowitz, "Wrong Number? Blame Companies' Recycling," *The Wall Street Journal* (Dec. 1, 2011) (citing FCC sources).

15. These data are for all numbers as I was unable to identify data solely for cell phones. However, the churn rate for cell phones should be substantially lower since when people move to new states and/or area codes they *must* get a new landline number but they can retain their existing wireless number. As such, the numbers presented here represent a very conservative floor.

16. Obviously, the exact number would be determinable by reference to the carrier information for the current subscribers, and the service start date.

conceded was likely available) the precise phone numbers where the subscriber identification has not changed since the messages were sent 5 to 8 years ago can be objectively determined, along with the names and contact information for those subscribers.

### *Family Plans*

31. In the data I found a total of 5,950 phone numbers were referred where the sender and recipient phone number were on the same network and therefore potentially part of a "family plan" on the same account. This leaves 7,096 phone numbers that are not on the same network and thus are not potentially part of a family plan.

32. Defendants appear to have sent lists of numbers where the sender and recipient were on the same network. Results from those subpoenas presented the following data:

| Carrier | Numbers Submitted | Same Account | Percent |
| --- | --- | --- | --- |
| Sprint | 765 | 46 | 6.01 |
| US Cellular | 266 | 88 | 33.08 |
| Verizon | 2,367 | 443 | 18.72 |
|  | **3,398** | **577** | **16.98%** |

33. Applying the average of 16.98% to the 5,950 referred numbers with the sender and received on the same network were in fact on the same account, this indicates that approximately 1,011 phone numbers[17] in the 13,046 phone numbers (i.e. 7.7%) I identified in my first report that received subject messages after a referral, were referred by a number within their "family plan."

## Conclusions

34. Mr. Sponsler's approach seems to be to stir everything into a singular mass problem and then declare it unmanageable merely because he claims there is no single "public" database that has 100% perfect contact information for 100% of the phone numbers in this case. This is not problem-solving, but rather problem-exaggerating. To the contrary, breaking the task into manageable pieces demonstrates the task is both quantitatively and qualitatively manageable.

---

17. The exact number can be determined after all the carriers report their data on all 13,046 phone numbers.

**PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

35. Simple mathematics indicates that nearly three-fourths of the recipients are expected to be easily identifiable through the data identifying the *current* subscribers from the phone carriers—data even Mr. Sponsler admits the carriers have. For the remaining recipients many, if not all, carriers *do* have historical data that will identify those subscribers. If any contact information for significant numbers of users are still unknown after that, reliable third party databases such as Experian and Lexis will certainly identify many if not all of the remaining numbers.

36. The claimed problem of a person "refers" a number that is in their own "friends and family" (which Mr. Sponsler seems to suggest that indicates that referral was made with express consent) is easily solved, as shown by the subpoena responses from the carriers and from simple logic.

37. The methodologies I have described in this report for identifying the holders of telephone numbers are both administratively feasible and efficient.

38. The methodologies I have described in this report for identifying the telephone numbers that are within the "friends and family" plans are both administratively feasible and efficient.

39. The facts, conclusions, and opinions stated herein are made to a reasonable degree of scientific certainly based upon examination of the information cited herein. The principles and methods I have used are reliable, repeatable, and generally accepted. To the extent any portion of this report is based on limited information or where further analysis, testimony, opinions, or information are provided, the contents of this report are subject to revision and supplementation.

Robert Biggerstaff, CCE

Cert. No. 1360

January 5, 2017

PROPRIETARY AND CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Table of Exhibits

1. None